## GAS CONSUMERS' ASS'N, Inc., v. LELY.
### No. 5243.

Court of Appeals of the District of Columbia.
Argued Dec. 10, 1931.
Decided Feb. 1, 1932.

Rehearing Denied March 19, 1932.

Harlan Wood and John S. Barbour, both of Washington, D. C., for appellant.

E. F. Colladay, J. C. McGarraghy, and S. F. Colladay, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and VAN ORSDEL, HITZ, and GRONER, Associate Justices.

HITZ, Associate Justice.

This is an appeal from a judgment of the Supreme Court of the District of Columbia based upon a verdict for the plaintiff in a negligence case.

The plaintiff below, appellee here, is the administrator of the estate of John Coutsouvelis, deceased, for whose death by the alleged wrongful act of the defendant below and appellant here the suit was brought.

This death occurred in the District of Columbia, on February 12, 1927, the decedent

leaving a wife and two children to whose support he contributed, though at the time of trial on February 19, 1930, the wife and one child had died.

The decedent was employed as a night cook by Gratsias and Lucas, proprietors of a lunchroom in the city of Washington, Lucas and the decedent working by night and sleeping by day, and both men, having worked through the night of February 11th, retired to a bedroom behind the lunchroom at about 9 o'clock on the morning of February 12th.

They were heard talking and laughing together at half past 9 or 10 o'clock, after which they were never again seen or heard alive, but were found dead in bed at 6 or 7 o'clock in the evening.

It was a cold day; the steam-heating plant was out of order; and a small gas stove was found turned on but unlighted in the bedroom. When found, the men had been dead from one to eight hours, and the cause of death was asphyxiation by illuminating gas.

At about half past 11 o'clock on the morning of February 12th two workmen of the defendant company were sent to the lunchroom by their foreman to remove or repair a gas governor, an appliance installed and rented by the defendant company for use on gas pipes or gas meters to diminish the consumption of gas.

When the workmen of the defendant company reached the lunchroom, the helper worked upon a gas stove in the kitchen, while his superior worked upon the gas governor at the meter in the lunchroom adjoining, the door being open between these rooms.

In the course of this work on the governor the workman broke it, necessitating his installation of another governor, which required cutting off the gas at the meter for a short time, which he did, and later turned on the gas again when his work was completed.

The theory of the plaintiff's case as presented in the declaration, the argument at the trial, and the charge of the court, was that Coutsouvelis and Lucas were asleep in their bedroom with their gas stove lighted when the defendant's servant cut off the flow of gas at the meter, thus putting out their stove, and that, when he later restored the flow of gas at the meter, it poured unignited through their gas stove into their bedroom, with the fatal result.

The plaintiff charges that the defendant's servant was negligent in the performance of his work, and that the evidence shows his negligence to have been the proximate cause of the death.

The defendant company by its plea admits that it undertook the work of repairing or installing a gas governor at the time and place in question; avers that said work was performed by its servants with due care, diligence, and skill; that, upon inquiry made, its servants were not advised by the householder of any gas fixture in Lucas' bedroom, or that any one was sleeping therein; and denies any negligence by its servants in the matter.

The court denied motions of the defendant company for a directed verdict; granted certain instructions; submitted the issues to the jury; and a verdict was rendered for the plaintiff in the sum of $5,000, upon which a judgment was rendered after denial of motions for a new trial.

In this court six assignments of error are filed:

(1) The court erred in refusing to grant the defendant's motion for a directed verdict upon the close of the plaintiff's case.

(2) The court erred in refusing to grant the defendant's motion for a directed verdict upon the close of the entire case.

(3) The court erred in overruling the defendant's motion to set aside the verdict and grant a new trial.

(4) The court erred in granting the plaintiff's instruction No. 1.

(5) The court erred in its charge to the jury.

(6) The court erred in permitting the jury to speculate on the cause of the injury to the decedent, in the absence of evidence supporting the allegations of the declaration.

■ Of these assignments of error, the first is based upon the denial of a motion for a directed verdict at the close of the plaintiff's case, the exception to which was waived by the defendant company when it proceeded with its case upon its evidence, and therefore requires no discussion here.

■ And, similarly, the exception to the court's denial of a motion for a new trial needs no discussion, as no showing of abuse of discretion is attempted, or could be justified by the record if it were.

■ The fifth assignment of error that "the court erred in its charge to the jury" is too general for consideration here, and the record does not show that any exception was taken when the charge was delivered or that any objection was made to it which the trial court could consider and correct.

The remaining assignments present differing aspects of the same question, as to whether or not at the end of the whole case the plaintiff was entitled to go to the jury, and to hold the verdict when rendered.

A gas light company is bound to exercise such care, skill, and diligence in all its operations, and in the transaction of all its business, as the difficulty, delicacy, and danger of its business requires. Its fittings must be of the highest character, and every precaution for safety must be taken within the bounds of reason. Gas Co. v. Getty, 96 Md. 683, 54 A. 660, 94 Am. St. Rep. 603; Heh v. Gas Co., 201 Pa. 443, 50 A. 994, 88 Am. St. Rep. 819; Holly v. Boston Gas Co., 8 Gray (Mass.) 123, 69 Am. Dec. 233; Butcher v. Gas Co., 12 R. I. 149, 34 Am. Rep. 626; Chisholm v. Gas-Light Co., 57 Ga. 28; Dillon v. Washington Gas-Light Co., 1 MacArthur (8 D. C.) 626.

If that principle controls a gas light company, whose business is touched with a public interest, and partakes, in a measure, of the obligations and privileges of a common carrier, a lighter rule cannot be applied to a corporation whose business it is to interfere for its own profit with the established arrangements between a gas light company and its customers, and existing fittings which it finds in operation.

The negligence of the defendant's servants, as alleged and denied in this cause, can be well considered by a somewhat detailed examination of the evidence touching the work done and the persons concerned in it. The work was done by the defendant's servants, Rainey and Boteler, who were sent to do it by their foreman or superior officer, Hill, who did not himself visit the scene until everything was over and the men were dead. Hill was a registered gas fitter; twenty years in the service of the defendant company; while Rainey had served an apprenticeship under Hill, but was not a licensed gas fitter at the time of this work, nor at the time of the trial some three years thereafter. Boteler was helper to Rainey, and he apparently did no work upon the gas governor on this occasion, but worked upon the gas stove in the kitchen, and did not appear at the trial.

Rainey testified that, when he arrived at the lunchroom, he talked with Gratsias, the proprietor, touching the advantages of the gas governor and the saving to be made by its use.

Gratsias testified that he told Rainey he knew nothing about a gas governor, but, after Rainey's explanation, he consented to have the work done and pay a monthly charge for use of the governor. The day was Saturday, and busy; the time was about half past eleven and Gratsias was in the kitchen cooking for luncheon at twelve o'clock, assisted by two girls.

The gas meter and governor were in the dining room behind the piano, where Rainey went to do his work, the helper remaining in the kitchen with Gratsias. Rainey soon returned to the kitchen saying he had broken the governor; then Rainey got a new governor; returned to the meter, and while at work there shouted, "Boys, I am going to cut the gas off a minute to put this new one on. I won't take long."

Thereupon Gratsias put out the gas in the kitchen and called to the waitress in the lunchroom to extinguish it there.

In four or five minutes Rainey came into the kitchen saying he had finished, whereupon Gratsias lit up his stove and resumed his cooking.

Rainey then helped Boteler finish his job and they went away together shortly before 12 o'clock.

Gratsias further testified that all rooms on the ground floor had gas appliances served by the same meter, but he did not mention them to Rainey because Rainey did not ask him, and Gratsias did not know the men in the bedroom were using their stove.

Rainey did not ask if there were any appliances outside of the kitchen and dining room, and made no examination for any. Rainey did not tell him to extinguish the appliances he saw, but simply told him that he was cutting the gas off at the meter for a few minutes.

The waitress testified that there were several gas jets in the dining room under the steam table and coffee urns; the gas men went into the dining room and kitchen where she could hear them talking with Gratsias; and later some one called out to extinguish the gas in the dining room, which she did. The man behind the piano near the meter said he would have to cut the gas off, and later said everything was all right and that she could turn on the gas again, which she did.

Neither of the gas men made any inspection of the appliances in the dining room, nor asked about gas appliances elsewhere in the building.

Rainey testified that the governor broke while he was cleaning it, which necessitated his installation of a new one; that he told

Gratsias that he would have to turn off the gas at the meter; that all appliances must be shut off; that he asked Gratsias if there were any appliances other than those in the kitchen and dining room, to which Gratsias replied that all appliances were off downstairs and the upper floor was unoccupied.

When he restored the flow of gas at the meter, he went out and himself lit the appliances in the kitchen and dining room and let the air off the line, but before doing this he watched the test dial on the meter with a spot light for three or five minutes and ascertained that no gas was flowing.

He made no personal investigation of any rooms back of the kitchen, and did not run out the pipes leading from the gas meter to see where they led.

The record gives the following account of an important part of Rainey's testimony: "I told Mr. Gratsias that I would have to cut the gas off and in response to that he said 'go ahead,' and I told him I would have to shut off all the stoves and coffee urns. He told me to finish the job as soon as I could. After he shut everything off, I saw that the meter was at a standstill and then cut the gas off at the meter. I was using a flash light as it was dark behind the piano. Before I cut the valve off I noticed that the dial on the meter was registering."

In this testimony Rainey says in one place that before he cut off the gas he observed the meter and that it showed no flow. At another place he says, speaking of the same moment, that the dial was registering. It may well be that he was speaking in the latter instance of the time prior to the turning out of the gas from the kitchen burners, but we have no means of knowing what he meant except by what he said, and the language used is consistent with an admission which the subsequent event seems to indicate was true, namely, that, after the burners then known to be in use were all turned off, the gas was still passing through the meter. We think from the record that the jury might reasonably have so understood it. And, if Rainey stated that the dial on the meter was registering after all appliances in kitchen and dining room had been extinguished, then it was evident that some other appliance served by that meter was in use before he cut off the valve, and notice thereof was directly before his face.

On cross-examination he testified that the gas was positively turned off when he was cleaning the old governor and when he was installing the new governor, and that the test dial, which registers the smallest flow of gas, did not show any flow.

He also made inconsistent statements regarding his age, which were of no such importance to the issue as his reading of the meter, but which may have affected his credibility as a witness, for on direct examination he said he was twenty-six years old at the time of trial, which would make him twenty-three when he did this work, while on cross-examination he said he was about twenty when this work was done.

These inconsistent statements in Rainey's own testimony were in addition to flat contradictions between Rainey and Gratsias and the waitress touching what he said and did when he turned off and restored the flow of gas.

But precisely what he said, and exactly what he meant, when saying apparently inconsistent things, were questions to be determined by the jury which heard and saw him as he said them.

And the testimony of Rainey was the only evidence from an eyewitness of the work and the circumstances thereof which was offered by the defendant, for Boteler, its other servant on that job, was not produced as a witness, and his absence was accounted for only by Rainey's remark that, "I don't know where he is now or whether he lives in Maryland."

So that, when the case closed on all the evidence and the defendant moved for a directed verdict, the court was confronted with these contradictory statements involving a somewhat interested witness, although at the time of the trial Rainey was no longer employed by the defendant.

But no man is a disinterested witness where his testimony relates to the performance or nonperformance of his duty, especially where two human lives have been snuffed out by the transaction under consideration.

Where such a witness testifies that he performed his duty, but other facts in evidence are inconsistent therewith, the question is for the jury to decide. Texas & P. Ry. Co. v. Carlin, 189 U. S. 361, 23 S. Ct. 585, 47 L. Ed. 849.

We are of opinion that in this state of the evidence the defendant's motion for a directed verdict was properly denied.

And in our view these considerations also dispose of the sixth assignment of error that the court erred in permitting the jury to speculate on the cause of the injury.

The only remaining assignment of error is numbered 4, based on the granting of plaintiff's first prayer for instructions as follows: "The jury is instructed that it was the duty of the defendant, acting through its agents, in turning off and on the gas incident to the installation of the gas governor, to exercise the care which a reasonably prudent person would exercise under similar circumstances, being charged with knowledge of the danger which might result to an occupant of the premises, if for any reason the gas might flow into any part of the premises without being lighted, and if you find by a preponderance of the evidence that defendant's agents did not exercise such degree of care and that the death of John Coutsouvelis was the proximate result of defendant's negligence in this regard, then your verdict should be for the plaintiff."

We consider that prayer to be within the law applicable to the case and justified by the pleadings and the evidence.

We have considered the cases cited by the appellant from courts of high authority to the general effect that the responsibility of a gas light company to its customers ends at its meters on the customers' premises, and does not usually extend to the householders' appliances for using the gas nor to the inhabitants of his house.

But we are of opinion that, under the peculiar facts, circumstances, and contradictory evidence of this case, and as between the parties to this record, it was for the jury to decide whether the two young men sent to do this work for the defendant company exercised such care, diligence, and skill as reasonable and prudent men would use in dealing with a dangerous instrumentality, both poisonous and explosive. The case was given to the jury under proper instructions, and with evidence sufficient to support a verdict for the plaintiff if the jury should take his view of it, which it did; and the judgment upon that verdict should therefore be affirmed.

It is thought that the following cases support the views of this opinion: R. & D. Ry. Co. v. Powers, 149 U. S. 43, 13 S. Ct. 748, 37 L. Ed. 642; Marande v. Ry. Co., 184 U. S. 194, 22 S. Ct. 340, 46 L. Ed. 487; Ry. Co. v. McDade, 191 U. S. 64, 24 S. Ct. 24, 48 L. Ed. 96; Sonnentheil v. Brewing Co., 172 U. S. 408, 19 S. Ct. 233, 43 L. Ed. 492; Beyer v. Gas Co., 44 App. Div. 158, 60 N. Y. S. 628; Ry. Co. v. Cobleigh (C. C. A.) 78 F. 784; Elwood v. W. U. Tel. Co., 45 N. Y. 549, 6 Am. Rep. 140; Anderson v. Gaslight Co., 17 Misc.

Rep. 625, 40 N. Y. S. 671; Thurston v. McLellan, 34 App. D. C. 294.

The judgment is affirmed.

Affirmed.