**MURRAY v. GADSDEN et al.**

No. 11197.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 9, 1952.

Decided May 22, 1952.

---

2. J.A., p. 40.

3. Ibid.

Before CLARK, WILBUR K. MILLER and PROCTOR, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

On April 11, 1941, Emma G. Murray signed an instrument, prepared on a printed form, declaring her substantial savings account in the Perpetual Building Association to be thereafter a joint account in the names of herself and her sister, Vellmar G. Gadsden, "subject to order of either, and balance at death of either to the survivor."[1] Mrs. Murray signed two other forms, essentially identical with the first, on January 12, 1945, and December 23, 1946, respectively, in which she declared her two savings accounts in the Equitable Cooperative Building Association to be thereafter joint accounts in the names of herself and Mrs. Gadsden. Each of the forms was signed also by Mrs. Gadsden and by one witness.

Mrs. Murray died September 24, 1950. Mrs. Gadsden then withdrew the balances in the three accounts and deposited the money in her individual name. Soon thereafter, Mrs. Murray's administrator sued Mrs. Gadsden and the two building associations in the United States District Court for the District of Columbia, alleging Mrs. Murray had not intended the instruments to give Mrs. Gadsden a present interest in the savings accounts, and asking the court to declare the balances therein to be the property of his decedent's estate.

The building associations answered, setting forth the balances in the accounts at the date of death and praying the court to adjudge which claimant was entitled to receive the money.

Vellmar G. Gadsden moved for summary judgment, which was denied. Thereafter, she filed her answer, basing her de-

J. Flipper Derricotte, Washington, D. C., for appellant.

Alden W. Hoage, Washington, D. C., for appellee Vellmar G. Gadsden.

Samuel Scrivener, Jr., Washington, D. C., entered an appearance for appellee, The Perpetual Building Association.

1. The complete text of the document follows:
"This declares the undersigned to be members of the Perpetual Building Association of the District of Columbia, subject to all the provisions of its Constitution and By-Laws, from the *11th* day of *April 1941*, and the account in Series *80-1208* to be theirs as joint owners, sub-

ject to order of either, and balance at death of either to the survivor. Signed in duplicate.
"Name *Emma G. Murray*
"Address *928 S ST. N. W.*
"Name *Vellmar G. Gadsden*
"Address *149 T St. N. W.*
"Witness *W. S. Martindill*"

fense principally upon the theory that the three printed forms signed by Mrs. Murray created a joint tenancy which conclusively established her right, as survivor, to the balances in the accounts at Mrs. Murray's death; that the parol evidence rule prevented extrinsic proof to the contrary.

After hearing evidence and making findings of fact therefrom, the trial judge concluded as a matter of law that each printed form was

> " * * * a contract between Emma G. Murray and Vellmar G. Gadsden, which declared the account to be theirs as joint owners, subject to the order of either, and the balance, at death of either, to the survivor."

Then, relying upon our decision in Matthew v. Moncrief, 1943, 77 U.S.App.D.C. 221, 135 F.2d 645, 149 A.L.R. 856, the trial judge held that "such a written expression is conclusive and preclusive of all parole [*sic*] contradiction, there being no proof or allegation of fraud before this Court," and dismissed the administrator's complaint. He appeals.

In considering the case it must be remembered the accounts originally belonged to Mrs. Murray, the decedent. If the survivor, Mrs. Gadsden, is now entitled to them, ownership must somehow have passed from the decedent to her. She could have acquired the title which she claims only through a bequest, a contract, a trust, or a gift made by Mrs. Murray. The inquiry is, therefore, (a) whether the deposit memoranda, which the decedent signed and upon which the survivor bases her claim of title, bequeathed the accounts to Mrs. Gadsden, or (b) amounted to a contract under which she can now claim them, or (c) established a trust in her favor by virtue of which she now owns the corpus, or (d) amounted to a gift of the accounts by Mrs. Murray to Mrs. Gadsden so that the latter is now entitled to the balance.

■ (a) Mrs. Murray did not validly bequeath the accounts to her sister because the deposit memoranda were not executed in conformity with the Statute of Wills.

■ (b) The theory that Mrs. Gadsden owns the accounts by virtue of contracts cannot stand, for several reasons. In the first place the deposit declarations were at most contracts between the two individuals on the one hand and the building associations on the other. They were not contracts between the two women, as we hold later in this opinion. There was no consideration expressed, and none was pleaded or proved. Even if regarded as contracts between Mrs. Murray and Mrs. Gadsden, the documents did not set up a contractual arrangement giving title to Mrs. Gadsden as the survivor; for if the so-called contracts were to be effective only at Mrs. Murray's death, then they were testamentary in character and obviously ineffective for that purpose,—and any earlier transfer of title attributed to them could only have been by way of gift, which will be discussed hereinafter.

■ (c) We turn to the trust theory, although Mrs. Gadsden did not plead and does not argue that the deposit documents created an immediately effective trust in her favor under which the corpus passed to her at the settlor's death. She did suggest in her testimony that Mrs. Murray orally expressed a desire that at her death the accounts be divided among her surviving sisters. That amounts to saying the deposit memoranda established a testamentary trust, which could be done only by a validly executed will. So the validity of the trust theory depends on whether the instruments executed by Mrs. Murray established an immediately effective trust in Mrs. Gadsden's favor.

■■ The mere language of the deposit documents, which makes no mention of a trust, does not raise the presumption that one was established. Even had it done so, the presumption would have been rebuttable. It is the donor's act which originates a trust and, when that result is attributed to some act of his, it is the intent with which he did the act which is material in determining whether a trust was in fact created.

These principles are well established by the decisions of the Maryland Court of Appeals, which we select from the welter of

cases in many jurisdictions as being well reasoned, persuasive and sound.

In 1899 the Maryland court wrote two opinions which have become leading cases in that jurisdiction. It was confronted with two different situations concerning bank accounts which originally had been owned by one Elizabeth O'Neill. With respect to one of those accounts,[2] while Miss O'Neill was alive she caused the following entry to be made:

"Metropolitan Savings Bank, in Account with Miss Elizabeth O'Neill. In trust for herself and Mrs. Mary Whalen, widow, joint owners, subject to the order of either; the balance at the death of either to belong to the survivor."

The court held this entry "constitutes a valid declaration of trust, in the absence of contravening proof * * *." But, despite the presumption that Miss O'Neill intended to establish a trust, which was raised by the language of the entry, the court held the presumption to be rebuttable and said the criterion was what she intended to accomplish. In that connection the opinion said, 43 A. at page 44:

"* * * It is the donor's act which originates the trust, and it is the intension with which he does the act that is material. The entry, unexplained, is a sufficient declaration of trust, because it indicates an intention to establish a trust, but this may be rebutted."

The companion case of Whalen v. Milholland, 1899, 89 Md. 199, 43 A. 45, 46, 44 L.R.A. 208, dealt with another bank account owned by Elizabeth O'Neill, who caused an entry to be made with respect thereto which did not contain the words "in trust for herself and Mrs. Mary Whalen," which appeared in the first case. This time the notation which she signed read as follows: "Elizabeth O'Neill and Mary Whalen. Joint owners. Payable to the order of either, or the survivor." The Maryland court held this language did not constitute a valid declaration of trust because it lacked the words of the entry in the other case which definitely indicated the intention of establishing a trust and raised a presumption to that effect. The words "joint owners" were said to be insufficient to raise such a presumption.

The later case of Coburn v. Shilling, 1921, 138 Md. 177, 113 A. 761, 768 had to do with a deposit entry by which the original owner of a bank account designated it as being in his name in trust for himself and another, to which were added the words "joint owners, subject to the order of either, balance at the death of either to belong to the survivor." Thus the case fell within the holding of the first Milholland case and the language of the deposit entry raised the presumption that a trust had been established. The proof tended to show that the arrangement had been made merely for the convenience of the original owner in having withdrawals made for him. The Maryland Court of Appeals held that such proof sufficiently rebutted the presumption that a trust was established which had arisen from the language of the deposit entry.

In this case the deposit documents do not contain any language from which the presumption of an intention to create a trust might flow. And even if the words "joint owners" could be thought to raise such a presumption (we agree with the Maryland court in rejecting the idea), it would be rebutted by proof tending to show the arrangement was only for Mrs. Murray's convenience.

Practically all cases on the trust theory involve situations in which it was contended that the original owner of the account had made himself a trustee for himself and another. We recall no case in which it was suggested that the original owner, in changing his account into the names of himself and another as joint owners, had made the person whose name he added a trustee. But whether the theory be that the original depositor was a trustee or that the newly added co-depositor was such seems immaterial; for the question remains whether the original depositor intended to establish a presently effective trust. We have seen that, when his intention was merely to serve his own conven-

---

2. Milholland v. Whalen, 1899, 89 Md. 212, 43 A. 43, 44 L.R.A. 205.

ience in handling his account, there was no trust. Later in this opinion we deal with the subject of Mrs. Murray's actual intention in executing the deposit declarations.

(d) Although she does not discuss the theory of gift in her brief, Mrs. Gadsden's position is, as we understand it, that the documents clearly expressed Mrs. Murray's intention to make her (Mrs. Gadsden) a technical joint tenant of the account, with resultant survivorship. That contention is, in effect, that there was a present gift, as otherwise the documents were merely testamentary in character. We therefore construe Mrs. Gadsden's theory as being that the three deposit agreements were clear expressions of Mrs. Murray's intention to make gifts to her as of the dates they were executed, and that a different intention cannot be shown by parol. That brings us to the first question.

## I

That question is whether the parol evidence rule prohibited extrinsic proof that Mrs. Murray did not intend, in executing the three instruments, to give Mrs. Gadsden a present interest as a joint tenant with resultant survivorship. Mrs. Gadsden relies heavily on Matthew v. Moncrief to sustain the judgment in her favor. The facts of that case were almost identical with those of the case before us. There the Perpetual Building Association was the

stakeholder and the declaration of ownership and survivorship was in the same form as those here involved. This court's summary of the complaint in that action, which was dismissed as containing no allegation entitling the plaintiffs to relief, is reproduced in the margin.[3]

An examination of that summary makes it at once apparent, as the court said, that Mrs. Davidson, the original owner of the accounts, intended the declaration of joint ownership merely to authorize Mrs. Moncrief to make withdrawals for her, at her request and for her convenience,—and nothing more. Mrs. Moncrief understood that to be her purpose and agreed to respect her wishes; indeed, "she realized that words of the joint account *did not express the true intention of the parties.*" If the true intention of the parties had been allowed to prevail, it would have been necessary for the court to hold Mrs. Davidson's declaration of joint ownership did no more than set up an arrangement for her convenience during her life, under which Mrs. Moncrief could withdraw moneys for her. It would also have been necessary for the court to hold the declaration ineffective as a testamentary disposition of the account (which was the only effect that could be given to it as an instrument of transfer, in view of the parties' agreement that a present transfer was not intended) because

3. 77 U.S.App.D.C. 221, 135 F.2d 645:
"The complaint, in substance, was as follows: For some years, Mary J. Davidson had a large account on deposit with the Perpetual Building Association in the District of Columbia. On June 16, 1937, with an account approximating $7,260.00, she determined that her health would no longer permit her accustomed visits to the Building Association to draw on this fund. In consequence of her condition, she deemed it necessary to make provision for the periodic withdrawal of these funds by someone else. Having confidence in her sister Laura, the appellee, she selected her for this purpose, and the two women went together to the office of the Building Association. The Building Association supplied a printed form of joint account which was executed by each of them. The form contained a provision that Mary's account should belong to both Mary and appellee *as joint*

*owners*, subject to the order of either, *with the balance at the death of either to the survivor.* Although *both women signed the instrument*, it was understood between them at the time that the arrangement was only as a convenience to Mary, and that the appellee was to make withdrawals only as and when requested by Mary, and nothing more. Appellee so understood the purpose of the agreement and agreed to respect and perform Mary's wishes; she realized that the words of the joint account *did not express the true intention of the parties.* About six weeks thereafter Mary died. Her estate was duly probated in the District of Columbia. *The account was not disposed of by her will.* Eleven days after Mary's death, appellee converted the fund to her own use by having the account transferred to her name." (Italics in original opinion.)

it was not executed in conformity with § 19–103 of the D.C.Code (1940), which requires two witnesses to a will.

This court held, however, in the Matthew case, that the instrument signed by the two individuals was a contract with the Perpetual Building Association which expressed Mrs. Davidson's clear and unequivocal intention to make Mrs. Moncrief a joint owner of her account, with the right of survivorship; that in the absence of an allegation of fraud or mistake, the parol evidence rule required the instrument to be construed as giving the account to Mrs. Moncrief as the surviving joint tenant, regardless of Mrs. Moncrief's concession that the true intention of the parties was not to make her a joint tenant, but merely to serve Mrs. Davidson's convenience during her life by authorizing Mrs. Moncrief to make withdrawals for her, at her request.

Matthew v. Moncrief, if it be followed, unquestionably controls this case and requires the affirmance of the District Court's judgment. The question is whether we should adhere to its holding, which construed and applied the parol evidence rule so strictly as to enforce the terms of a written instrument signed by two parties when both agreed it did not express their agreement.

In the later case of Harrington v. Emmerman, 1950, 88 U.S.App.D.C. 23, 186 F. 2d 757, we again considered the printed form furnished by the Perpetual Building Association for opening joint accounts which was construed by this court in the Matthew case. The survivor, Miss Emmerman, argued the document was a contract between Mrs. Carlin, the original owner of the account, and herself, by which a joint tenancy was created. She relied upon the parol evidence rule as requiring the declaration of joint ownership to be given effect regardless of what Mrs. Carlin may actually have intended, and pressed Matthew v. Moncrief upon us as controlling.

We pointed out in the Harrington opinion that the Matthew case, and the earlier cases of Quigley v. Quigley,[4] Quigley v. Whyte,[5] and Garrett v. Keister,[6] had not considered the question whether, by executing the joint deposit agreement, the original depositor transfers the account, or an interest in it, *in praesenti* to the person whom he designates as joint owner. That question must be answered in determining whether joint tenancy was created, as we show later in this opinion.

We held in the Harrington case that, when a depositor creates a joint account for himself and another, without consideration, it is presumed to have been done for the convenience of the depositor; that the printed form was not conclusive between the two individuals as to whether a present gift had been intended; that whether the printed form gave Miss Emmerman a present interest in the account depended upon whether Mrs. Carlin intended to make such a gift; that Miss Emmerman had the burden of establishing a gift.[7] Although we

4. 1936, 66 App.D.C. 134, 85 F.2d 300.

5. 1936, 66 App.D.C. 135, 85 F.2d 301.

6. 1932, 61 App.D.C. 25, 56 F.2d 909.

7. We quote the following from the Harrington opinion, 88 U.S.App.D.C. at 27, 186 F.2d at 761:

"* * * the controlling issue in the case was whether the deposit agreement in fact gave Miss Emmerman a present one-half interest in the fund. That depended on whether Mrs. Carlin intended it to do so, for there can be no gift if the alleged donor did not intend to make one. Moreover, the donee has the burden to establish a gift. Myers v. Tschiffely, 1934, 64 App.D.C. 17, 73 F.2d 657. And when a depositor creates a joint account for himself and another, without consideration, it is presumed to have been done for the convenience of the depositor. * * *

"To be sure, the deposit agreement described the two women as 'joint owners' and provided that either might draw on the account; but the agreement was on a printed form supplied by the building association, presumably for its own purpose and protection. Some such form probably would have been required by it to safeguard its own interests even had Miss Emmerman then stated the arrangement was merely for the convenience of Mrs. Carlin. The writing was conclusive as between the two women on the one hand and the building association on the other, but was not conclusive between the individuals as to whether a present gift had been intended."

pointed out that Mrs. Carlin's committee attacked the instrument while she was still alive, that fact would have been immaterial had we held the parol evidence rule prohibited proof of the original depositor's actual purpose, as was held in the Matthew case. So the Harrington opinion had the effect of holding the parol evidence rule does not forbid inquiry into the object of the parties in executing and receiving a written instrument. We thus recognized and applied one of the exceptions to the subtle and difficult parol evidence rule which courts have found it necessary to work out. This particular exception is well established, as shown by the cases to which we now refer.

■ The Supreme Court, in Peugh v. Davis, 1877, 96 U.S. 332, 336, 24 L.Ed. 775, said with reference to the rule:

"It is an established doctrine that a court of equity will treat a deed, absolute in form, as a mortgage, when it is executed as security for a loan of money. That court looks beyond the terms of the instrument to the real transaction; and when that is shown to be one of security, and not of sale, it will give effect to the actual contract of the parties. As the equity, upon which the court acts in such cases, arises from the real character of the transaction, any evidence, written or oral, tending to show this is admissible. The rule which excludes parol testimony to contradict or vary a written instrument has reference to the language used by the parties. That cannot be qualified, or varied from its natural import, but must speak for itself. The rule does not forbid an inquiry into the object of the parties in executing and receiving the instrument."

Again, in Brick v. Brick, 1878, 98 U.S. 514, 516, 25 L.Ed. 256, the Court said, "It is competent to show by parol what the transaction was," and added,

"* * * In the late case of Peugh v. Davis (96 U.S. 336, 24 L.Ed. 775) we stated the doctrine of equity on this subject, where an instrument was in form a conveyance, but was in fact intended as a security; and though the instrument there was a deed of real property, the principle applies when the instrument purports to transfer personal property."

In Cabrera v. American Colonial Bank, 1909, 214 U.S. 224, 230, 29 S.Ct. 623, 626, 53 L.Ed. 974, the Court said the parol evidence rule is

"* * * absolutely necessary if the written instrument is to be given a distinctive sanction of the agreement of the parties. But there are well-recognized exceptions. The face of an instrument is not always conclusive of its purpose. In equity, extrinsic evidence is admitted to show that a conveyance absolute on its face was intended as security. The rule regards the circumstance of the parties and executes their real intention, and prevents either of the parties to the instrument committing a fraud on the other by claiming it as an absolute conveyance, notwithstanding it was given and accepted as security. In other words, the real transaction is permitted to be proved."

Peugh v. Davis and Brick v. Brick were cited, among other cases, in support of this statement. As was stated by the Court of Appeals of Ohio in Steiner v. Fecycz, 1942, 72 Ohio App. 18, 50 N.E.2d 617, 621, a

"* * * contract creating a joint and survivorship bank account is no more sacred or inviolable than a deed of real estate, a bank account created by will in a single name, or a bill of sale of any personal property."

■ This is a salutary exception to the parol evidence rule, because a court of equity should not permit the rule to defeat the admitted, or clearly proved, intention of the parties. It should be remembered too that a writing which is called a contract is merely a memorial of the parties' agreement. It is simply evidence of the agreement and, if it be clear that it does not accurately reflect what the parties had agreed upon, monstrous injustice would be done by forcing upon them a contract

which they had not actually made.[8] As a consequence, the exception to the parol evidence rule to which we have referred permits inquiry into the real purpose of the parties and, if necessary, amendment of the writing to accomplish that purpose. Professor Wigmore says, " * * * the amendment ought not to be conceived as a change or correction of the actual agreement."

■ We conclude that, when it is alleged a written instrument does not express the actual intention of its signers, the court may receive parol evidence as to what their real purpose was; and that, should a variance be found between the true agreement and its written expression, the court may reform the writing to cause it to express the actual intention of the parties. This exception to the parol evidence rule apparently was overlooked by this court in its consideration of Matthew v. Moncrief. We think the exception should have been recognized and applied in that case.

## II

What did Mrs. Murray intend to accomplish by signing the declarations of joint ownership? The administrator's complaint alleged his decedent executed the documents without consideration, merely for her own convenience, and without intending to make Mrs. Gadsden the present owner of the savings account or of any interest therein. It was also averred in the complaint that, after Mrs. Gadsden's name was added as a co-depositor, Mrs. Murray retained the passbooks, made all subsequent deposits and withdrawals, reported the dividends as her own taxable income, and throughout her life continued to regard the accounts as her sole property. These allegations amount to the statement that, if the language of the printed forms transferred a present interest, Mrs. Murray signed them through mistake.[9]

None of the foregoing allegations was expressly denied by Mrs. Gadsden's answer. She did plead there was no understanding between Mrs. Murray and herself as to the use or disposition of the accounts, and stated the passbooks were turned over to her "a long time" before Mrs. Murray's death. She admitted all the funds deposited were funds of Mrs. Murray. She further said in her answer:

"* * * the language used on the application with the respective Building Associations clearly expresses the intent of the parties and any other statement or contention to the contrary is denied."

---

8. 9 Wigmore, Evidence § 2417, p. 59 (1940 ed.). On page 60 Professor Wigmore quotes the following:

"1869, James, V. C., in Mackenzie v. Coulson, L. R. 8 Eq. 368: 'Courts of equity do not rectify contracts; they may and do rectify instruments purporting to have been made in pursuance of the terms of contracts.'

"1858, Ames, C. J., in Diman v. [Providence, W. & B.] R. Co., 5 R.I. 130: 'A court of equity has no power to alter or reform an agreement made between parties, since this would be in truth a power to contract for them; but merely to correct the writing executed as evidence of the agreement, so as to make it express [to all the world] what the parties actually agreed to. It follows that the mistake which it may correct in such writing must be, as it is usually expressed, the mistake of both parties to it; that is, such a mistake in the draughting of the writing as makes it convey the intent or meaning of neither party to the contract.' "

9. In considering the issue thus presented, it is well to remember the printed forms signed by Mrs. Murray were furnished by the building associations. Their object in framing them, it may be inferred, was to bring themselves within the protection of § 26–201 of the D.C.Code (1940), which provides: "When a deposit shall have been made in * * * any * * * building association * * * in the names of two or more persons *. * * payable to either, or payable to either or the survivor or survivors, such deposit * * * may be paid or delivered to either of said persons whether the other or others be living or not; and the receipt or acquittance of the person to whom such payment * * * is made shall be a valid, sufficient, and complete release and discharge of the * * * building association * * *." Few laymen understand the legal significance of joint tenancy.

Whether the forms signed by Mrs. Murray and filed with the building associations expressed her real purpose was, therefore, clearly in issue. While the usual inquiry is as to the purpose of both parties, the important question here is concerning Mrs. Murray's intention. We may assume Mrs. Gadsden intended, by signing the documents, to accept whatever was thereby conferred upon her; but whether she then intended the documents to create a technical joint tenancy is immaterial. The accounts were the sole property of Mrs. Murray, and what she actually intended to accomplish by signing the written declarations is the proper subject of inquiry.

 We assume, for the present discussion, without deciding, that one who makes a deposit of his own funds in the names of himself and another may thereby create a joint tenancy of the account;[10] but we hold that such a joint tenancy is not established unless it is the result of a gift or a trust as a condition precedent. See annotations in L.R.A.1917C, 551, 571; 48 A.L.R. 203; 66 A.L.R. 891; 103 A.L.R. 1133.

 If the instruments gave Mrs Gadsden no interest *in praesenti*—if they became operative only at Mrs. Murray's death—then they were testamentary in character, and ineffective, for the reason heretofore noted. As there is no suggestion here of the establishment of a trust, a joint tenancy was not created unless Mrs. Murray intended the deposit agreements to operate as a gift of a present interest in the funds. Whether she so intended was the controlling issue. There can be no gift if the alleged donor did not intend to make one. Moreover, one who claims to be a donee has the burden of establishing a gift. Harrington v. Emmerman, 88 U.S.

App.D.C. 23, 27, 186 F.2d 757, 761, and cases there cited.

We held in the Harrington case that the declaration which put the account in two names, while conclusive as between the two women on the one hand and the building association on the other, was not conclusive between the individuals as to whether a present gift had been intended. We cited Castle v. Wightman, 1939, 303 Mass. 74, 20 N.E.2d 436, a case in which the signature card used the word "joint" in describing the relation created, and quoted the following from the court's opinion:

"* * * Thus, in cases of joint deposit, while the contract of deposit is conclusive as between the parties and the bank, yet it may be shown that, for example, the execution of the contract of joint deposit was procured to be made by the depositor by the exercise of undue influence upon him, (case cited), or that it was intended as a matter of convenience, (case cited), or that it was void if intended by the depositor to hinder, defraud or delay his creditors, (case cited), or that the gift of the interest in the joint account was one upon a trust, (case cited); in brief, that the result of a present gift was not intended." [88 U.S.App.D.C. 23, 186 F.2d 762.]

 So Mrs. Gadsden had the burden of proving that Mrs. Murray intended to make a gift *inter vivos* when she signed the instruments. She introduced no evidence in her own behalf but did testify, at the call of the administrator, both in a discovery deposition[11] and at the trial. Moreover, her affidavit was filed in support of her motion for summary judgment. As no other witness testified with respect to Mrs. Murray's intention, all the information we

---

10. In Harrington v. Emmerman, at footnote 8, we suggested that the relation created by the deposit agreement was a tenancy in common and not a joint tenancy, for reasons there set forth. But here, as there, our decision does not depend upon that proposition.

11. The deposition was not used in the trial except that portions of it were read

to Mrs. Gadsden while she was testifying, in an effort to impeach her. As those portions appear in the transcript of evidence, Mrs. Gadsden's motion to exclude the discovery deposition from the record on appeal was granted by the District Court. For that reason, we do not consider it.

have on the subject came from Mrs. Gadsden.

In her motion for summary judgment Mrs. Gadsden said:

"5. The Plaintiff did not produce any testamentary writing to show that the deceased intended any disposition of these accounts, other than was indicated on her opening the account with the respective defendant associations, which provided that the balance, at death of either, would go to the survivor."

In her supporting affidavit she said:

"5. The deceased, Emma G. Murray, indicated by her act in signing the above accounts, with the balance at death of either to the survivor, that Vellmar G. Gadsden, if she survived Emma G. Murray, would receive the balance in said account. The deceased further stated to Vellmar G. Gadsden, in the presence of other sisters, that after her death, she desired Vellmar G. Gadsden to divide the proceeds equally with two other sisters of the deceased. This statement was made at the time of the opening of the first of the above joint accounts."

Neither of these statements indicates an intention on Mrs. Murray's part to make a present gift, but, to the contrary, both tend to show she intended the documents to have only a testamentary effect.

Mrs. Gadsden's testimony at the trial also tended to show that Mrs. Murray's purpose in executing the deposit agreements was to provide for the disposition of her savings accounts at her death.[12] She did not say her sister ever expressed the intention to make a present gift to her of the accounts or of any interest therein. To be sure, she indicated that she had regarded the accounts as her own,[13] but, as we have said, Mrs. Gadsden's opinion, expressed at the time of trial, as to the effect of the instruments, was not important. The question was, what had Mrs. Murray intended to accomplish, and on that subject Mrs. Gadsden was silent. Apparently her innate sense of honesty prevented her from making the flat statement which would have lent support to her legal theory, *viz.*, that Mrs. Murray expressed an intention to make her a present gift of an interest in the accounts.

Her conduct was inconsistent with her statement that she regarded the accounts as her own. She testified she never exercised dominion over them during Mrs. Murray's life. She made no deposits except for her sister, and made no withdrawals as long as her sister lived except that on September 7, 1950, some two weeks before Mrs. Murray's death when she was in a coma, Mrs. Gadsden withdrew $461 from the Perpetual account to reimburse herself for some of the expenses of the decedent's last illness which she had personally paid. Although she testified that she had had the passbooks four or five years before Mrs. Murray's death, she explained her possession of them by saying:

"* * * she left her books with me because she wanted me to keep her books, because she did not want Mr. Murray to have her money in those books. That was her own money, every penny of her own money in

12. She was asked these questions and made these answers:

"Q. Did she ever say what she wanted done with the money in the bank [building associations]? A. I said in the beginning she wanted that divided among her sisters.

"Q. You were to get the money if you outlived her, and distribute it to your sisters? A. That is right."

13. "Q. Let me ask you this and I am directing your attention to the account at Perpetual: Did you at any time regard this money in the Perpetual as your money? A. Yes, it was my money. She made me survivor.

"Q. Just answer my question. A. Yes, yes.

"Q. Did you regard it as your money? A. Yes.

"Q. When did you do that? A. Well, when she made me co-owner of it. I knew that.

"Q. From the time she made you co-owner of it, you regarded it as your money, is that right? A. Yes, that is right."

those books. She had to take care of herself. So, therefore, she wanted me to keep her books for her."

It thus appears that Mrs. Murray did not turn the passbooks over to Mrs. Gadsden at the times the accounts were changed into two names, but handed them to her later, and then only for her own convenience and not in evidence or furtherance of a gift.

■ The requisites of a valid gift *inter vivos* are delivery, intention on the part of the donor to make a gift, and absolute disposition of the subject of the gift. Harrington v. Emmerman, 1950, 88 U.S. App.D.C. 23, 186 F.2d 757; Cashman v. Mason, 8 Cir., 1948, 166 F.2d 693; Lust v. Miller, 1925, 55 App.D.C. 217, 4 F.2d 293. In Lee v. Lee, 1925, 55 App.D.C. 344, 5 F.2d 767, we held an unqualified declaration of gift to be ineffective because the agreement by which the subject of the gift (a trunk with valuable contents) was deposited with the trust company permitted withdrawal either by the donor or the donees. This retention of dominance by the donor was held to defeat the gift.

■ In this case Mrs. Gadsden's testimony shows Mrs. Murray's retention of dominance over the accounts. Her testimony as a whole shows beyond peradventure, not only that the decedent executed the declarations concerning the accounts without consideration, and for her own convenience merely, but also without intending to give her sister a present interest. The District Court made no finding to the contrary.

With respect to the administrator's allegations of indicia that Mrs. Murray intended to retain the accounts as her own until her death (those allegations being that she alone made all deposits and withdrawals, reported the dividends as her own taxable income, and retained the passbooks), the District Court made no findings of fact except these:

"9. That Defendant Gadsden did have custody over the pass or deposit books of the accounts described in 5(a), 6(a), and 7(a) above, for four or five years prior to the death of Emma G. Murray.

"10. That Defendant Gadsden did make withdrawals from said account in The Perpetual Building Association during the lifetime of Emma G. Murray."

While these findings are not inaccurate, they are incomplete. They should have been elaborated by adding that Mrs. Gadsden—as she herself testified—was keeping the passbooks for her sister, at her sister's request and for her sister's convenience; and that the only withdrawals made by Mrs. Gadsden were—as she herself testified—to reimburse herself for certain expenses of Mrs. Murray's last illness which she had personally paid because her sister, being in a coma, was unable to pay them. As thus explained, Mrs. Gadsden's custody of the passbooks did not indicate an intention on Mrs. Murray's part to make her a "present owner" of any interest in the three accounts, and her withdrawal from the Perpetual account did not tend to show she had exercised dominion over the account as though it were then her own.

We observe, however, that the trial judge did not rely upon the incomplete factual findings Nos. 9 and 10 in reaching a decision. His conclusions of law may be summarized as follows:

(a) the agreements [declarations] constituted contracts between Mrs. Murray and the associations, between Mrs. Gadsden and the associations, and *between Mrs. Murray and Mrs. Gadsden;*

(b) Mrs. Murray's written expression of intention that the three accounts were to go, on the death of either, to the survivor "is conclusive and preclusive of all parole [*sic*] contradition, there being no proof or allegation of fraud or mistake before this Court"; and

(c) "* * * this Court finds, under these circumstances, that Mrs. Murray's clearly written and plainly expressed purpose cannot be re-written after her demise, or deprive Mrs. Gadsden, the Defendant, of rights in contracts to which she was a party-signatory."

Our view that the parol evidence rule should not have been applied has already been stated. The District Court also erred in holding the joint deposit declarations were contracts between the two women. Harrington v. Emmerman, supra. At most, they were contracts only in the sense of being declarations of gifts. As we have said, the presumption in the circumstances was that the documents were not memorials of gifts but were intended to set up an arrangement for Mrs. Murray's convenience. Mrs. Gadsden did not overcome the presumption, as she failed to show an intention on Mrs. Murray's part to make gifts *in praesenti*. Her own testimony showed Mrs. Murray intended, for her personal convenience during her life, to authorize Mrs. Gadsden to make withdrawals for her,—a limited purpose which Mrs. Gadsden clearly understood.

The claimant, Mrs. Gadsden, testified that Mrs. Murray intended, by executing the instruments, to provide that at her death Mrs. Gadsden should have the balances in the accounts for the purpose of sharing the money equally with other surviving sisters, to the exclusion of her husband.[14] But, as we have shown she did not establish a technical joint tenancy with resultant survivorship, Mrs. Murray could accomplish the purpose which Mrs. Gadsden attributed to her only by making a will directing that her accounts be divided among her sisters. This she did not do. Our decision, therefore, has the effect of frustrating what Mrs. Gadsden said was Mrs. Murray's testamentary desire. That effect is inevitable because, if she did in fact have such a testamentary intention, she unfortunately chose a means of expressing her desire which the law does not recognize as a valid will. Consequently, she was intestate with respect to the savings accounts and, as a result, her husband is entitled to share in the net funds along with his deceased wife's sisters.

The cause will be remanded so the District Court may set aside the judgment appealed from, and enter another awarding to the administrator the balances in the three accounts as of September 24, 1950, with subsequently accrued dividends thereon and with costs.

Reversed and remanded.

14. The District Court did not find this to be the fact, and indeed made no finding with respect to it.