Bolton D. UCKELE, Appellant,

v.

Eugene JEWETT, Appellee.

No. 93–CV–39.

District of Columbia Court of Appeals.

Argued Jan. 21, 1994.
Decided May 23, 1994.

Joel M. Finkelstein, Washington, DC, for appellant.

Dennis F. Nee, Washington, DC, for appellee.

Before FERREN,* Acting Chief Judge, FARRELL, Associate Judge, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

Appellant (a grandson) brought an action to set aside his grandfather's transfers of real and personal property to his son (appellee) on grounds that his grandfather lacked the necessary mental capacity to transfer his realty and personalty and that these trans-

fers resulted from undue influence by his son (appellee). At the end of the grandson's case,[1] the trial court concluded that there was no evidence to support his claims that his grandfather lacked the mental capacity to convey the real property and that the transfer resulted from undue influence by the son (appellee). The trial court then entered a directed verdict in favor of the son as to the grandfather's conveyance of realty, but allowed the jury to determine whether the grandfather had made a gift to his son with respect to funds initially deposited into joint bank accounts. The jury rendered its verdict in favor of the grandson, but it was then overturned by the trial court which granted the son's motion for judgment notwithstanding the verdict. Appellant here contests the foregoing trial court's rulings. We affirm the trial court's directed verdict as to the conveyance of realty, but reverse the trial court's entry of judgment notwithstanding the verdict with respect to the gift of funds initially deposited in the joint bank accounts.

## I.

In May of 1987, Harold Jewett, an 89-year old retired patent lawyer and widower, executed a will which divided his estate equally between Eugene Jewett, his son (appellee), and Bolten Uckele, his grandson (appellant). By December of that same year, however, Harold Jewett had transferred the bulk of his savings to joint bank accounts with his son, Eugene Jewett, as a joint signatory. Eugene subsequently withdrew the funds from these joint bank accounts and invested the money in joint stock accounts naming himself and his father, Harold Jewett, as co-owners.[2] In October of 1988, Mr. Jewett executed a deed which transferred ownership of his residence on 42nd Street, Northwest in the District, to his son. After Harold Jewett's death in February 1990, appellant Bolten Uckele (the grandson) filed a complaint against Eugene Jewett (the son) in the Superior Court alleging fraudulent transfer of the

---

* Judge FERREN was an *Associate Judge* of this court at the time of argument. His status changed to *Acting Chief Judge* on March 18, 1994.

1. This grandson was born of appellee's sister.

2. Eugene Jewett testified that he had also contributed money to these joint stock accounts.

real and personal property and seeking to quiet title on the real property.

At trial, appellant's evidence in contesting the transfers consisted of the testimony of family members who had visited Harold Jewett. Leslie Jewett, Eugene Jewett's ex-wife, testified that after Harold Jewett recovered from an illness in late 1985, he exhibited signs of short term memory loss and had difficulty recognizing his relatives. She also stated that in 1986, Mr. Jewett was unconcerned about the cleanliness of either himself or the household which was described as being "infested with roaches." Fletcher and Lyon Jewett, Eugene Jewett's sons, also testified about Harold Jewett's failure to recognize family members and the general uncleanliness of his house. Fletcher further stated that on one occasion, appellee Eugene Jewett previously indicated that he resented sharing Eunice Jewett's (Harold Jewett's wife's) estate with Uckele and vowed that it would not happen again. Fletcher and Lyon also testified that appellee did not have a close "father and son" relationship with Harold Jewett. Ms. Lily O'Dell, a housekeeper who was hired in February of 1986, testified that at one time, Mr. Jewett initially refused to accept the delivery of his own carpets and drapes which had been sent to the dry-cleaners. She stated that he finally accepted the drapes and carpets. Ms. O'Dell indicated that her last visit with Harold Jewett was in January of 1987.

In opposition, Dr. Joel Guiterman, who had performed a physical examination of Harold Jewett on September 20, 1989, testified that Mr. Jewett's responses to the mental status portion [3] of the exam were appropriate. Kip and Scott Shuda, two tenants who had lived with Harold Jewett from August 1989 to May 1990, stated that Mr. Jewett had no problem recognizing them and that he had a good rapport with appellee. In addition to this testimony, Eugene Jewett stated that his father gave·him the house as well as the funds deposited into the joint bank accounts. There was also evidence demonstrating that Harold Jewett had managed his personal finances [4] and handled his medical affairs [5] at the time he conveyed his property to appellee.

At the close of plaintiff's case, defense counsel for Eugene Jewett filed a motion for directed verdict on the ground that there was no evidence to establish a prima facie case of either mental incapacity or undue influence. In granting this motion, the trial court stated:

[T]he question is could a jury on this evidence soundly conclude or reasonably conclude that ... [Harold] Jewett lacked capacity to make these gifts in 1987 and '88.

The evidence in brief put on by the plaintiff is that he lived in filthy conditions, that he was not attentive to his health in the sense of making sure that the roaches stayed out of his food. That he had difficulty recognizing his grandchildren.

There is no evidence put on by the [appellant] that [Harold Jewett] was unable to ... recognize the nature and extent of his property.... [The] evidence is completely overwhelmed in the Court's view by the evidence that he in fact was paying bills, negotiating with the District over disputed bills, tax bills, keeping track of minor amounts of money, making detailed notes.... [E]ven in '88, and I believe some of the notes bore, dates in '89, there was no indication in any of them that he lacked the ability to recognize the nature and extent of his property or to determine the natural beneficiaries of his bounty and make decisions about what he was going to do.

And so as to the capacity, that is, the ability to make a gift or a conveyance, if he chose, I find that there isn't sufficient evidence in this record, even construing the evidence as a whole, looking at the evi-

3. Dr. Guiterman explained that the mental status exam is comprised of questions which are designed to determine whether the patient is aware of his surroundings as well as his ability to think in an abstract manner.

4. This evidence consisted of Harold Jewett's payments toward his telephone bill, utility bills, and other personal creditors.

5. In 1989, Harold Jewett, without assistance from his family, made all the necessary arrangements to undergo a hernia operation.

dence as a whole from a vantage point most favorable to the plaintiff, for a jury to reasonably conclude that ... [Harold] Jewett lacked the capacity to make the gifts. It just isn't there.[6]

At the conclusion of all the evidence, however, the trial court submitted the case to the jury to determine the remaining issue of whether Harold Jewett had made a gift to his son with respect to the funds initially deposited in the joint bank accounts.[7] The jury found that Harold Jewett did not make a gift of these funds to his son. Eugene Jewett then moved for a judgment notwithstanding the verdict. This motion was granted by the trial court. In granting the motion, the trial court explained that the evidence establishing a gift was "overwhelming" and that under these circumstances a reasonable jury could only conclude that a gift was intended by the grandfather. This appeal followed.

## II.

■ In reviewing a directed verdict, we must "view the evidence in the light most favorable to the party against whom the verdict is sought." *Jackson v. Condor Management Group, Inc.*, 587 A.2d 222, 224 (D.C. 1991); *see also Lenkin–N Ltd. Partnership v. Nace*, 568 A.2d 474, 477 (D.C.1990); *Ceco Corp. v. Coleman*, 441 A.2d 940, 944 (D.C. 1982). "If the evidence is such that no reasonable person could find for the plaintiff, then the question should not be put before the jury." *Lenkin–N Ltd. Partnership, supra*, 568 A.2d at 477. However, "[a]s long as there is *some* evidence from which jurors could find the necessary elements [of a prima facie case], a trial judge must not grant a directed verdict." *Marshall v. District of Columbia*, 391 A.2d 1374, 1379 (D.C.1978) (emphasis added).

■ Within this framework, we turn first to appellant's contention that the trial court erred in granting appellee's motion for directed verdict as to the grandfather's conveyance of the realty. "The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the particular transaction in which [he] is engaged, ... whether or not [he] is competent in transacting business generally." *Butler v. Harrison*, 578 A.2d 1098, 1100 (D.C.1990) (citations omitted). In applying this test, there is a presumption that "an adult is competent to enter into an agreement and the burden of proof is on the party asserting incompetency." *Id.* at 1100–01. Therefore, the party asserting incompetency to contract is required to establish "not merely that the person suffers from some mental disease or defect such as dementia, but that such mental infirmity rendered the person *incompetent to execute the particular transaction* according to the standard set forth above." *Id.* at 1101 (emphasis added).

■ In this case, there is evidence that Harold Jewett's living conditions were unsanitary and unhealthy, and that he had difficulty recognizing family members. However, the record is devoid of any evidence demonstrating that Mr. Jewett was incompetent at the time to execute the conveyance of the real property to appellee. During Leslie Jewett's cross-examination, she stated that despite Harold Jewett's short-term memory lapses, he continued to manage his personal finances and that he had made all arrangements with respect to his hernia operation in 1989. When asked whether Harold Jewett was mentally competent to execute his will in May of 1987, Leslie Jewett (appellee's ex-wife) responded that she could not answer the question as she was not with him on that particular day. Ms. Jewett's response to this

---

6. The trial court also indicated that there was no evidence in the record to establish that anybody took advantage of Harold Jewett.

7. In its ruling to submit the issue of the gift to the jury, the trial court stated:

My innate sense of caution suggests that with the very high standard, and there should be, it remains a jury question. I will at least reserve

my ruling to see what the jury does with it on the issue of gift. I think it's close.... I wouldn't preclude the possibility of judgment NOV if the jury went the other way. But I think in the long run it will serve the interests of judicial economy and justice to be sure that we have the jury's view of the subject.

question is representative of the lack of evidence establishing that Harold Jewett was incompetent at the time he conveyed his property to his son. Notwithstanding the testimony describing Harold Jewett's memory lapses and uncleanliness, there is no evidence in the record from which a reasonable jury could infer that Harold Jewett lacked "sufficient mind to understand, in a reasonable manner, the nature, extent, character, and effect of the particular transaction[s] in which [he had] engaged ... or that [he was not] competent in transacting business generally." *Id.* at 1100 (internal citations omitted). Accordingly, we find that the trial court committed no error in concluding as a matter of law he possessed the mental capacity to convey the real property, and therefore, correctly directed the verdict.[8]

### III.

■ Turning next to the trial court's decision on the issue of the gift of the funds initially deposited into the joint bank accounts, "we examine the evidence in the light most favorable to the prevailing party." *Jefferson v. Ourisman Chevrolet Co.*, 615 A.2d 582, 584 (D.C.1992) (citing *Finkelstein v. District of Columbia*, 593 A.2d 591, 594 (D.C. 1991) (en banc)). Similarly, "[a] judgment notwithstanding the verdict is proper only in cases in which no reasonable juror could reach a verdict in favor of the prevailing party." *Id.; Kane v. Ryan*, 596 A.2d 562, 564 (D.C.1991); *Washington v. Washington Hosp. Ctr.*, 579 A.2d 177, 181 (D.C.1990); *Oxendine v. Merrell Dow Pharmaceuticals*, 506 A.2d 1100, 1103 (D.C.1986). If there is some evidence from which a jury could find the necessary elements, or when the case turns on disputed facts and witness credibility, the case is for the jury. *Washington Welfare Ass'n v. Poindexter*, 479 A.2d 313, 315 (D.C.1984); *see also District of Columbia v. Gandy*, 450 A.2d 896, 900 (D.C.1982), *mod-*

*ified on other grounds*, 458 A.2d 414 (D.C. 1983).

■ However, "[t]he burden of proving that a transfer was an inter vivos gift is upon the party asserting the gift, and when the gift is asserted after the donor has died it must be established by clear and convincing evidence." *Estate of Presgrave v. Stephens*, 529 A.2d 274, 280 (D.C.1987) (citing *Davis v. Altmann*, 492 A.2d 884, 885 (D.C.1985)); *see also Chamberlain v. Chamberlain*, 287 A.2d 530, 531 (D.C.) ("burden rests with the party asserting the gift"), *cert. denied*, 409 U.S. 892, 93 S.Ct. 132, 34 L.Ed.2d 149 (1972). Generally, "[t]he requisites of a valid gift *inter vivos* are delivery, intention on the part of the donor to make a gift, and absolute disposition of the subject of the gift." *Duggan v. Keto*, 554 A.2d 1126, 1134 (D.C.1989) (citing *Murray v. Gadsden*, 91 U.S.App.D.C. 38, 49, 197 F.2d 194, 205 (1952)). In the instant case, the contested gift involves funds which were initially deposited into joint bank accounts. We have recognized that "[w]here a party opens a joint account for himself [or herself] and another without consideration, the account is *presumed open for the convenience of that party.*" *Estate of Presgrave, supra*, 529 A.2d at 280 (quoting *Davis, supra*, 492 A.2d at 885) (emphasis supplied); *see Richardson v. District of Columbia*, 522 A.2d 1295, 1298 (D.C.1987) (per curiam); *Harrington v. Emmerman*, 88 U.S.App.D.C. 23, 27, 186 F.2d 757, 761 (1950).

In reviewing the trial court's reasons for overturning the jury's verdict, it appears that the trial judge merely reweighed the evidence and disagreed with the jury's verdict. While the trial judge correctly acknowledged that it is within the jury's role to assess the credibility of the witnesses, he, nonetheless, found that the son's testimony was credible and that the evidence establishing a gift was overwhelming. Curiously, the trial court

---

8. We also find no error in the trial court's finding that there was no evidence in the record to support appellant's claim that the transfers of realty and personalty resulted from undue influence by appellee. *See generally Roberts–Douglas v. Meares*, 624 A.2d 405, 420 (D.C.1992) (confidential relationship alone does not furnish any

presumption of undue influence); *Butler, supra*, 578 A.2d at 1102 (absent proof of coercion, confidential relations are insufficient to establish undue influence); *Estate of Broun v. Broun*, 413 A.2d 1310, 1313 (D.C.1980) (suspicion of undue influence is not enough); *Himmelfarb v. Greenspoon*, 411 A.2d 979, 984 (D.C.1980).

also noted that this issue was not "absolutely free of question." [9]

In determining whether a gift had, in fact, existed, the jury was allowed to consider the testimony of Eugene Jewett in light of the recognized presumption that funds deposited in the joint bank accounts were for the benefit of the depositor, the grandfather. "[I]f the witness has an interest in the outcome of the case, and ... if the evidence opposing [a] presumption is contradictory or reasonably subject to contradictory interpretations[,] *the question becomes one for the trier of the facts." Davis, supra*, 492 A.2d at 887 (quoting *Koehne v. Price*, 68 A.2d 806, 812–13 (D.C.1949) (emphasis supplied)). In fact, "many state cases hold that a presumption is *never overcome by testimony*, even though uncontradicted, if the [fact finder] disbelieves the testimony." *Id.* at 887 (emphasis added). *See also Rametta v. Kazlo*, 68 A.D.2d 579, 418 N.Y.S.2d 113, 114–15 (1979) (per curiam) ("Where the evidence presented to rebut a presumption raises an issue of credibility, it is for the trier of fact to determine whether the presumption has been defeated"); *Trujillo v. Chavez*, 93 N.M. 626, 603 P.2d 736, 740 (Ct.App.1979) ("Insofar as evidence against a presumed fact must be weighed for its credibility, the jury must be informed of the presumption in order that it may be given effect if it rejects the evidence in question") (citation omitted); *e.g., Brown v. Oklahoma Transp. Co.*, 588 P.2d 595, 601 (Okla.Ct.App.1978) (presumptions and permissive inferences are to be treated as evidence and entitle the party to whose benefit it inures to prevail unless the fact-finder determines that it has been overcome by sufficient evidence); *Bill's Auto Rental v. Bonded Taxi Co.*, 72 A.2d 254, 257 (D.C. 1950).

Here, appellee's claim that his father made a gift to him of the funds in the joint bank accounts rested upon his own testimony. Eugene Jewett testified that his father instructed him to open the joint bank accounts and that his father further indicated that it was his (Eugene's) money. However, Fletcher and Lyon Jewett, testified that their father, Eugene, did not have a close relationship with their grandfather, Harold Jewett. In addition, there was evidence which demonstrated that Eugene Jewett resented Bolton Uckele for having received property under Eunice Jewett's (Eugene's mother's) estate and that he vowed that it would not happen again. In light of the testimony given by the witnesses and the presumption that the joint bank accounts were opened for the convenience of Harold Jewett, the gift issue ultimately turned on the credibility of the witnesses, a matter properly before the jury. "Resolution of ... the witnesses' credibility ... [is an issue] left to the jury." *Mike Palm, Inc. v. Interdonato*, 547 A.2d 1016, 1021 (D.C.1988) (citations omitted). *See Kuder v. United Nat'l Bank*, 497 A.2d 1105, 1107 (D.C.1985) ("mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to be submitted to the jury as a question of fact") (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 628, 64 S.Ct. 724, 729, 88 L.Ed. 967 (1944)); *Mills v. Cosmopolitan Ins. Agency, Inc.*, 424 A.2d 43, 46 (D.C.1980) (when the case turns on controverted facts and the credibility of witnesses, the case is properly for the jury); *cf. Gas Consumers' Ass'n v. Lely*, 61 App. D.C. 29, 32, 57 F.2d 395, 398 (1932). Viewing the evidence in the light most favorable to appellant, and in view of the foregoing presumption on joint bank accounts, we conclude that there was sufficient evidence for the jury to find that the funds deposited into the joint bank accounts did not constitute a gift to appellee and therefore, the trial court erred in granting appellee's motion for judgment notwithstanding the verdict.

Accordingly, we affirm the trial court's directed verdict on the conveyance of the residence, but reverse its entry of judgment

---

9. After considering the parties' arguments on the motion for judgment notwithstanding the verdict, the trial court stated:

I find that the question, could a reasonable jury conclude as this one did, that no gift was intended under the circumstances, has to be answered in the negative.... [W]hile I suppose it wasn't absolutely free of question, ... [t]hat doesn't, ... in the context of the evidence, suggest that [the grandfather] couldn't change his mind about what he wanted to do.

notwithstanding the verdict on the gift of the personal property (the funds deposited into the joint bank accounts).

*So ordered.*