Bobby Ray BROWN, Plaintiff-Appellant,

v.

OKLAHOMA TRANSPORTATION COMPANY, a corporation, and Wilmar L. Johnson, Defendants-Appellees.

No. 51639.

Court of Appeals of Oklahoma, Division 2.

Nov. 28, 1978.

Released for Publication by Order of Court of Appeals Dec. 27, 1978.

Whit Pate, Poteau, for plaintiff-appellant.

Joseph A. Sharp and Jack M. Thomas, Best, Sharp, Thomas & Glass, Tulsa, for defendants-appellees.

BRIGHTMIRE, Judge.

It was a beautiful late summer day in LeFlore County, Oklahoma. Bobby Brown would not remember it, but the fact is that about the middle of the afternoon he was at the wheel of an old yellow pickup truck traveling eastward along U. S. Highway 271, three miles east of the town of Spiro. Soon he came to a private driveway, off to the north of the highway, into which he wanted to turn. He applied his brakes briefly and started to turn when suddenly the pickup's left side was smashed by a high velocity cross-country bus. The force of the 50 mile-an-hour impact was not spent until the truck and its seriously injured driver came to rest upside down in the bar ditch 134 feet down the road.

A month later the truck driver sued the bus owner, Oklahoma Transportation Company, and its driver, Wilmar Johnson. After denying fault, the bus company cross-petitioned for $5,464.24 damages to the bus. The jury found that the wreck was caused by the negligence of each driver and that each contributed a comparative percentage of 50 percent. Judgment was entered on verdict denying both parties relief. Plaintiff appeals assailing several rulings of the trial court, two of which he contends are reversible errors.

I

The accident occurred Friday afternoon, September 17, 1976. Evidently plaintiff did not testify because his brain had been so badly damaged he could remember nothing about the collision—a condition medically called retrograde amnesia. In his petition, plaintiff blamed defendants for the tragedy in that the bus driver violated the duty he owed plaintiff in one or more of these ways: (1) he did not have his bus under proper control; (2) he failed to maintain a proper lookout; (3) he failed to give a proper and timely signal and warning that he was about to pass; (4) he was operating the bus at a speed of 75 miles per hour—some 20 miles an hour over the speed limit; (5) he failed to properly apply the bus brakes in order to avoid the wreck; and (6) he failed to turn the bus before hitting the pickup.

The case came on for trial November 7, 1977. During voir dire, counsel for plaintiff began asking the prospective jurors whether any of them would have any trouble making an award for pain and suffering. One juror came up with a response lawyers for the injured usually only dream of: "Maybe I ought not to be on this. I've been suffering now for twenty-five years over an accident and I—I hurt right now and I still hurt and I—I couldn't put no price on pain. I know what is is, I know. It hurts, it hurts."

"Your Honor," said defense counsel, "I think on that statement, probably the man should be excused."

Thereupon, the trial judge and defense counsel asked the juror if his condition would affect his ability to be fair and impartial, even in dealing with the matter of pain and suffering.

"No," answered the juror, "not a bit."

Nevertheless, the judge excused the juror "in the interest of justice."

According to the partial trial transcript accompanying the record, plaintiff attempt-

ed to prove liability of the defendants with testimony of the highway trooper who investigated the incident. From the physical evidence he found at the scene and from talking to the drivers, he concluded that both vehicles were eastbound and that the bus was about to pass the pickup when it started turning left. The point of impact was thought by the officer to be six feet north of the 24 foot-wide roadway's centerline. The main damage to the bus was on the right front end and damage to the truck on the left door. Following the crash, the pickup traveled eastwardly 134 feet angling to the north enough to land upside down in the bar ditch adjoining an eight-foot paved shoulder; the bus traveled in the same general direction for a distance of 92 feet.

The trooper further concluded that the bus was traveling about 55 miles per hour shortly before the collision and 50 miles per hour at impact; the truck was doing 35 miles per hour before starting to turn and 10 to 15 miles per hour when it was hit. Neither vehicle, said the trooper, laid down any skid marks before meeting. Defense counsel established that a car traveling at 15 miles per hour covers about 20 to 22 feet per second and that it takes three-fourths of a second for the average driver to react to a danger after he becomes aware of it—a lapse called reaction time.

The 62-year-old bus driver, who had driven buses for 37 years, testified that on the afternoon in question he had stopped briefly at Spiro and was headed for Ft. Smith, Arkansas. The bus had just crested the nose of a hill, about three miles east of Spiro, and had started down a long straight gentle decline at about 52 miles per hour when Johnson saw a yellow pickup 200 or 300 yards ahead traveling in the same direction as the bus at about 25 miles per hour. The bus operator checked for oncoming traffic, saw none, crossed to the left side of the road and, when he got within 115 feet of the truck, honked his horn. He was about 15 or 20 feet from the rear of the pickup, said Johnson, when the truck brake lights came on and he saw it start to make a left turn "right straight across in front of me." The bus driver immediately applied the brakes, but alas, they did not take effect until "at the time of the impact, they just pulled the front of the bus down when the impact happened."

## II

Appellant's first contention is that the trial court erred in excusing the suffering prospective juror for cause after the panelist said he could be fair and impartial. We agree with appellant that it is difficult to understand why the prospect was excused. If having experienced pain disqualifies one to sit as a juror, courts would have a very hard time indeed finding anyone to serve. Of course, if the person's pain is of such a nature as to be disabling, that is a different matter. Here the would-be juror apparently was not disabled. Jurors are not prevented from invoking their experiences in resolving the factual problems and it would seem that where compensation for pain and suffering is one issue to be determined it could help the jury reach a just verdict to have the input of one who has experienced a good deal of pain—one of the supposed advantages of having 12 people on a jury. Actually, it is conceivable that the excused individual might be the only one to fully understand and properly evaluate the pain element of plaintiff's damages. For these reasons we think the trial court should not have excused the jury candidate for cause.

It is true the trial court has a very broad discretion in determining the competency and qualifications of jurors under 12 O.S.1971 § 572. *Lee v. Swyden,* Okl., 319 P.2d 1009 (1957). This authority does not include, however, the right to weed-out or hand-pick jurors who possess or fail to possess some particular experience in life unless it is clearly shown that the juror cannot be fair and decide the case impartially. But regardless of the impropriety of excusing the juror in question, his absence evidently did not have a significant impact on the ultimate result because nine jurors agreed upon a no liability verdict.

### III

■ The second thing argued by Brown is that an oral instruction concerning an unadmitted exhibit was reversibly erroneous. It seems that plaintiff had brought his wrecked truck to the courthouse, parked it on the yard and covered it. At one point during plaintiff's examination of the patrolman, the jury was excused and plaintiff's counsel advised the court that he wanted permission to ask the trooper to identify the truck as the one involved in the accident preliminary to offering it into evidence as plaintiff's exhibit 10. This provoked an immediate defense objection which in turn precipitated a lengthy and interesting debate concerning the propriety of the jurors seeing such evidence. Defendants argued it would tend to prove nothing significant that was not already known by the jury and that the only purpose of the unusual exhibition was to inflame the triers of the facts. At first the trial judge thought perhaps it should be admitted as material demonstrative evidence which could aid the jury in understanding the facts. Then he waivered, nearly succumbing to the defense suggestion that the jury might reach conclusions from seeing the wreckage that the bus was going faster than the trooper thought or that the point of impact was not exactly where the officer said it was. In the end, the trial court tried to reach a compromise of a sort by deciding to let the jurors look at the exhibit but with the admonition that they were "not to draw any conclusions as . . . [to] the point of impact, nor the . . . speed . . . of either the pickup or the bus . . . ." For these conclusions, continued the judge, the jurors would have to rely upon the expertise of the investigating trooper.[1]

Counsel for plaintiff then asked that the pickup "be tagged as plaintiff's exhibit ten and be admitted into evidence."

"Wait a minute," said the court, "That's something else. Now, we're talking about two different things."

Following an unrecorded discussion "at the Bench" the judge said, "You can restate your request."

"Okay," said counsel, "At this time, Your Honor, we would withdraw our request it be introduced into evidence, and ask that the jury be permitted to view the pickup at this time."

Whereupon, over the objection of defendant, the court told the jurors he was going to let them look at the truck. After admonishing the jury as he said he would, the judge added, "Okay, now I'll go with you [and] the bailiff. The attorneys and the parties will stay here in court, so there won't be anybody down here at the truck pointing things out to you . . . ."

Plaintiff took exception to the admonition, the jury went out, looked at the damaged truck, and returned to the courtroom where defendant requested the pickup be removed from the courthouse parking lot before the jury left for home that evening.

This episode presents another bit of unusual trial procedure. The truck was indeed an exhibit requiring marking, proper identification and a decision as to its admissibility. The size of the exhibit, of course, posed a custodial problem which could be handled several ways. One way, for instance, would have been to require it to be photographed and stored in a safe place until released by court order. The fact that

---

1. Notwithstanding this instruction, the judge later contradictorily told the jurors in a traditionally stock instruction—number 16 regarding expert witnesses—that they "may consider the testimony of these witnesses, and give it such weight and value as you think it should have, but the weight and value to be given their testimony is for you to determine. *You are not required to surrender your own judgment to that of any person testifying as an expert, or to give controlling effect to the opinion of an expert, for the testimony of an expert, like that of any other witness, is to be received by you and given such weight and value as you deem it is entitled to receive.*" (emphasis added)

This is a standard instruction given in nearly every case featuring expert testimony. Curiously, the jury is told not merely to resolve conflicting expert opinions but, paradoxically, they can ignore expert testimony even as to matters which the law requires to be proved by expert testimony, e. g., medical diagnosis, causation, and prognosis.

nothing of this sort was done leaves us without any idea what it was the jury got to see—at least there is not a single photograph of the pickup in the record. And so, what we have is a complaint that over the objections of defendants the jury was allowed to examine unadmitted evidence—out of the presence of the parties and their lawyers—with instructions not to reach certain conclusions concerning it.

It seems to us that plaintiff got far more of an advantage than he was legally entitled to when the jury was allowed to look at the truck. Under the circumstances, the exhortation given fell short of what it should have been, namely, that the unadmitted exhibit was not to be considered for any purpose. We agree that had the pickup been admitted into evidence the viewing would have been proper and the judge would have been obliged to refrain from commenting at all on the evidence or from barring the parties and their lawyers. But aside from all this, we do not share plaintiff's view that the admonition was all that bad. We are inclined to think the jury, if they understood the instructions at all, would have gotten the idea that they were not to reach any conclusions about the point of impact or vehicular speeds merely from observing the truck but were to consider what they saw in evaluating the highway patrolman's expert testimony and determining its validity as required by written instruction 16. This construction at least creates some slight degree of compatibility between the oral instruction and the written one. Whatever else may be said about it, we are not persuaded that the preview direction contributed significantly to the verdict.

## IV

The most serious question raised by plaintiff is whether the trial court erred when he rejected the following instruction by plaintiff:

"You are instructed that in law a presumption is the deduction which the law expressly directs to be made from a particular fact or facts found or otherwise established in the trial.

"Now, in this case, if you find the plaintiff is suffering from retrograde amnesia and has no memory relative to the facts of this accident or how it occurred, then, I instruct you that there is a presumption under the law that the plaintiff was exercising due and proper care for the protection of his person and the preservation of his life at the time of the accident.

"This presumption arises from the instinct of self-preservation and the disposition of men to avoid personal harm. This presumption is not conclusive, but is a matter to be considered by the jury, in connection with all the other facts and circumstances of the case, in determining whether or not plaintiff was guilty of any negligence at the time of the accident."

Perhaps the first thing we should do is orient ourselves with reference to the presumption's position in the lawsuit by analyzing the legal structure of the case as it developed during the pleading stage. We mentioned earlier plaintiff commenced this lawsuit with allegations that the wreck was caused by defendants' failure to use due care. Defendants denied this but claimed alternatively that plaintiff's lack of care contributed to the cause to the extent of 50 percent or more—and by way of cross-petition defendants blamed the whole thing on plaintiff and requested judgment against plaintiff for the amount of damage done to the bus. At this point it can be seen that to prevail with regard to the relief sought in his petition, plaintiff had to present evidence in support of the allegations of his petition. The presumption in question certainly was not available to plaintiff as an aid in fulfilling the obligation to prove his allegations. His lack of memory, to put it otherwise, could not supplant proof that defendants were derelict. So, insofar as plaintiff's cause of action is concerned, there could be no error in denying plaintiff's request for the presumptive instruction.

The next question is—was the charge required as a result of issues raised by the

answer or cross-petition? We can quickly dispose of the latter because defendants failed to recover on their cross-petition—a result inuring to plaintiff's benefit which he has not expressed a wish to disturb.

But what about the issue of contributory negligence raised in defendants' answer?

 Presumptions are legal lifesavers tossed out by statute or decisional law to litigants foundering helplessly in a jurisprudential sea of injustice. Creation of a presumption is inevitably designed to affect the burden of proof by shifting it from the party possessed of the procedural device to his adversary. In reviewing the legal literature on the subject of presumptions, we find a good deal of confusion and obscurity some of which, upon closer examination, results from the use of loose language and misleading nomenclature in judicial opinions. Take for instance the definitional language of *Smittle v. Illingsworth*, Okl., 373 P.2d 78 (1962) pointing out the distinction between a "presumption of law" and a "presumption of fact." [2] What the author says is basically correct but difficult to follow the first time around. When you get down to it, all presumptions are of facts and so what the author really means is there are certain facts that the law by statute or judicial decision presumes, which may or may not require proof of foundation facts, and these are to be distinguished from acceptable inferences that the fact-finder might draw from certain proved

facts—called "presumptions of fact." *Rotramel v. Public Serv. Co.*, Okl., 546 P.2d 1015 (1975). For example, the law presumes, without proof of anything, a man to be innocent of a charge until the state proves otherwise—his guilt or innocence being an ultimate fact, of course.[3] On the other hand, what *Smittle* refers to as a presumption of fact is not really a presumption at all but a permissible inference of fact that the fact-finder may make deductively from certain other proved foundation facts. *St. John's Hosp. & School of Nursing, Inc. v. Chapman*, Okl., 434 P.2d 160 (1967); *Nebo Oil Co. v. Wright*, Okl., 406 P.2d 266 (1965).[4] Both legal presumptions and permissive inferences are to be treated as evidence—*Oklahoma City v. Prieto*, Okl., 482 P.2d 919 (1971)—which, according to *Chapman*, entitles the party to whose benefit it inures to prevail unless found by the fact-finder to have been overcome by sufficient evidence. It is only when the rebuttal evidence is so clear and convincing that reasonable minds would agree that it is true that the presumption can be said to have been overthrown as a matter of law.

 So far as we can find, the high court of this state has never had occasion to discuss the generally recognized presumption of law that one fatally wounded in an accident was using due care. *Lamp v. Pennsylvania R.R.*, 305 Pa. 520, 158 A. 269, 84 A.L.R. 1217 (1931).[5] Nor is there a case

---

**2.** Said the court:

"As we view defendant's argument, he is confusing a presumption of law with one of fact. A presumption of law is a mandatory deduction which the law expressly directs to be made from particular facts, while a presumption of fact is synonymous with 'that mental process by which the existence of one fact is inferred from proof of some other fact or facts with which experience shows it is usually associated by succession or coexistence'. *Stumpf v. Montgomery*, 101 Okl. 257, 226 P. 65, 69, 32 A.L.R. 1490; Wigmore on Evidence, 3rd Ed., § 2491, p. 288; 31 C.J.S. Evidence § 116, p. 726."

**3.** Referring to this burden of proof-shifting device as a presumption has been criticised as a misnomer because it is not based upon any facts suggesting the probability of innocence but it is merely an assumption aimed at allocat-

ing the burden of proof to the accuser. McCormick's Handbook of the Law of Evidence, 805 (2d ed. 1972).

**4.** This has been statutorily changed. Title 76 O.S.1976 Supp. § 21 directs that negligence in rendering medical care shall be presumed if plaintiff, while under the sole control of defendant, sustained an injury which usually does not occur absent negligence.

**5.** Oklahoma has adopted several kindred legal presumptions, e. g., that a man's death is not suicidal, *Modern Brotherhood of America v. White*, 66 Okl. 241, 168 P. 794 (1917); that a man will not make a fraudulent misstatement, *Republic Life Ins. Co. v. Burch*, 199 Okl. 445, 187 P.2d 242 (1947); that the conduct of men is lawful, *Norton v. Coffield*, Okl., 357 P.2d 434 (1960).

in this state applying a related legal presumption that proper care has been exercised by the driver of an automobile who suffered amnesia as a result of an accident—the presumption which is the subject of plaintiff's requested instruction. With varying circumscriptions, however, this presumption has been indulged by a host of other jurisdictions. *Breker v. Rosema*, 301 Mich. 685, 4 N.W.2d 57, 141 A.L.R. 867 (1942). Undoubtedly, the reason the appellate courts of this state have never been called upon to invoke the due care presumption as such is because our law procedurally places the burden of proof in such a way as to accomplish the same result. In other words, requiring plaintiff to prove he was tortiously injured by defendant has the effect of presuming the defendant innocent of wrongdoing until he is proved to be otherwise. Likewise, since a defendant has the burden of proving contributory negligence on the part of plaintiff, the effect is to clothe plaintiff with a presumption of having used due care. The need for the presumption is found mostly in those jurisdictions like Michigan, for example, where a plaintiff is required to prove freedom from contributory negligence. In *Breker* the presumption came to the aid of an amnesic plaintiff.

Although we disapprove of the argumentative form of instruction number five, it had the effect of instructing on plaintiff's presumed use of due care by stating that the "burden of proof as to contributory negligence rests on the party alleging same as heretofore set out . . . ." Incidentally, nothing regarding contributory negligence was "theretofore" set out. The only other thing said about the subject is in connection with an explanation of the comparative negligence law in instruction number 17. The burden of proof instruction, number one, discusses the allegations of plaintiff's petition and defendants' cross-petition but not the defense of contributory negligence. Under these circumstances, it was especially bad for the court to argue negatively on behalf of defendant that the mere proof of an accident or injury carries with it no presumption of negligence. Of course, it did not. How could it when the judge had already told the jury that plaintiff had the burden of proving the material allegation "of his claim . . . and unless [he has] . . . your verdict must be for the defendant?" Surely the judge did not presume that when he told the jury plaintiff had the burden of proving the allegations of his petition before he could recover that the jury would understand this to mean that mere proof of the accident injury created some sort of a presumption that defendant was negligent. Although unnecessary, it would have made more sense to give the requested due care presumption instruction in connection with instruction number five. In any event, the court's time would have been better spent instructing on the positive aspects of the contributory negligence defense than the misleading negative "mere proof" superfluity.

■ Since the jury under the instructions were advised that defendants had to prove that plaintiff was contributorily negligent, we cannot hold it reversible error to fail to also tell them that plaintiff is presumed to have used due care—which, as we have seen, he is in this jurisdiction irrespective of his amnesia.

## V

■ Plaintiff's final contention is that the trial court did not give the jury a general verdict form to use but one endorsed by the Oklahoma Supreme Court thrice since 1966. Although plaintiff identifies several cogent reasons why the law should be changed, the seeds of thought must perish in this court because, of course, we are bound by the holdings in *Downum v. Muskogee Stockyards & Livestock Auction*, Okl., 565 P.2d 368 (1977); *Smith v. Gizzi*, Okl., 564 P.2d 1009 (1977); and *Vaught v. Holland*, Okl., 554 P.2d 1174 (1976).

Affirmed.

NEPTUNE, P. J., and BACON, J., concur.