BYRON DIMAN *v.* THE PROVIDENCE, WARREN, AND BRISTOL RAILROAD COMPANY.

To enable a court of equity, upon the ground of mistake, to *reform* a written contract, the mistake must be proved to be the mistake of both parties; so that, by correcting the writing as requested, the court will make it express the contract designed to be entered into by both. A court of equity may, however, *rescind* and *cancel* a contract, upon the ground of a mistake of facts, material to the contract, of one party only; but where there has been no fraud or surprise to put the applicant for such relief off his guard, it must appear that the mistake was not the consequence of his own want of recollection from inattention, or of his own carelessness; and that by granting him the relief he asks, no injustice, and especially from the applicant's neglect to apprise him of the mistake, will be done to the other party to the contract.

Hence a subscriber to the stock of a railroad company, chartered, but waiting for subscriptions in order to organize under its charter, can have no relief in a court of equity on the ground, that when intending merely to renew an old subscription to the stock, which had fallen through, he, by some unaccountable mistake, subscribed for double the amount; such subscriber ascertaining his mistake immediately after his subscription, and suffering the company to organize and act upon the faith of his subscription, during several months, without notice of his alleged mistake.

BILL IN EQUITY, to reform a subscription of $2,000 to the capital stock of the Providence, Warren, and Bristol Railroad Company, upon the ground, that the same was made by the mistake of the complainant, when intending to subscribe for $1,000 only of said stock; and to stay an action at law, brought by the railroad company against the complainant, to recover the amount of said subscription, and for general relief.

It was proved that the complainant, in the year 1852, subscribed $1,000 to the stock of this railroad; but that the subscription fell through, because the whole amount subscribed was insufficient to make the subscription binding according to its terms. In the spring of 1853, another attempt was made to obtain subscriptions adequate in amount to enable the company, which had been chartered, to organize under its charter, and proceed with the undertaking for which it had been incorporated. Accordingly, several little subscription books were placed in the hands of the friends of the project, each of which was headed with the following printed form of subscription contract pasted upon the first page of the book, underneath which, and on the succeeding pages of the book, the names of the subscribers, with the number of shares and amount in money subscribed by each, set opposite to their names, were to be written. " We, the subscribers, severally agree to and with the PROVIDENCE, WARREN, AND BRISTOL RAILROAD COMPANY, that we will take the number of shares of *one hundred dollars* each, in the capital stock of said company, set opposite our respective names, under the provisions of its charter and any amendments thereto, made by the general assembly of this state; and that we will pay for the same in such manner as the said Providence, Warren, and Bristol Railroad Company, when duly organized, may, under its charter and any amendments thereto, direct. *Provided*, that this subscription shall not be binding, unless there are one hundred and seventy-five thousand dollars of the stock subscribed by responsible parties." One of these subscription books, with but one previous subscription upon it, was brought to the complainant at his house, by a friend and relative, Hon. F. M. Dimond,

to obtain his subscription to it; when, after some urgency to renew his subscription at least, if not to increase it, both of which the complainant at first refused to do, the complainant at last consented to renew his subscription, and, taking the book to his desk, with his own hand wrote in it underneath the above printed form of engagement, his name, and opposite to his name, in the appropriate spaces, the figures " 20," for the number of shares, and " 2,000," for the amount in money, of his subscription. After drying the ink at the fire, the complainant handed the book back to his visitor, who, without examining it in his presence, left immediately, and shortly after handed the book to others, as is common, to obtain other subscriptions from those with whom they are supposed to have the most influence. On the same day, the complainant casually heard of the amount of his subscription, which he at first denied, and on the next day, or within a day or two, called upon F. M. Dimond, who had brought the book to him, to correct his mistake, saying that he had only intended to renew his old subscription. He was informed by Mr. Dimond that he had handed the book to others, and that it was not in his possession; but that if it were, he would rectify the mistake, and subsequently that he would see the committee and have the matter put right. The mistake however, never was rectified; but upon the faith of this, and other subscriptions, to the requisite charter amount, on the 16th day of April, 1853, the railroad company was organized, and proceeded to make contracts and incur expenses in construction of their road, &c. Although it would seem to have been understood between the complainant and Mr. Dimond, who had procured his subscription, that early steps should be taken by the latter to apprise the officers of the company of the mistake and to endeavor to induce them to rectify it, no steps were in fact taken until some time in the summer or fall of 1853, and no written communication was made to them upon the subject, by either, until the 6th day of December, 1853. The officers of the company then declined to correct the mistake, if it were such, upon the ground that earlier application should have been made to them to do so, if at all; and, the complainant refusing to pay the calls upon his subscription, an action was

commenced against him by the company to enforce payment of them; to enjoin which, and to procure the other relief prayed for, as above stated, this bill was filed.

There was some proof tending to show that the complainant had professed a willingness to double his subscription, and had on one occasion stated that he had actually done so; but there was some indistinctness as to whether this might not have related to the first subscription; the complainant, who was a witness, positively denying it, and insisting that he had reluctantly consented even to renew his subscription.

*Wm. H. Potter*, for the complainant:—

Courts of equity have power to reform contracts in writing and correct mistakes in them, admitting parol testimony for the purpose. 1 Story, Eq. §§ 140, 152–156, 158; *Graves* v. *Boston Ins. Co.* 2 Cranch, 419, 444; *Andrews* v. *Essex Fire & Mar. Ins. Co.* 3 Mason, 10; *Delaware Ins. Co.* v. *Hogan*, 2 Wash. C. C. R. 5; *Keisselbrack* v. *Livingston*, 4 Johns. Ch. R. 148.

Courts of equity will grant relief against written contracts, not only when the proof is express, but also when it is fairly implied from the nature of the transaction. 1 Story, Eq. 162–168; *Le Roy* v. *Platt*, 4 Paige, Ch. R. 79; *Gouverneur* v. *Titus*, 1 Edw. Ch. R. 477; 2 U. S. Eq. Dig. 286, 288, 289.

*Hayes* and *Blake*, for the respondents:—

1st. The complainant is not entitled to have the written contract of subscription varied and reformed, as prayed for, because he has not *proved* the mistake alleged.

Courts of equity will grant relief by reforming written instruments, only where there is a plain mistake, clearly made out by satisfactory proofs, " and will not act" wherever the evidence is loose, equivocal, or contradictory, or it is in its texture open to doubt, or merely affords a presumption. 1 Story, Eq. § 157; *Gillespie* v. *Moore*, 2 Johns. Ch. R. 595–597; *Lyman* v. *United Ins. Co.* Ib. 630; *Taylor* v. *Fleet*, 4 Barb. S. C. 95; *United States* v. *Munroe*, 5 Mason, 572; *Goldsborough* v. *Ringgold*, 1 Md. Ch. Decis. 239; *Griswold* v. *Smith*, 10 Verm. 452; *Cleaveland* v. *Burt*, 11 Ib. 138; *Lyman* v. *Little*, 15 Ib. 576; *Preston* v. *Whitcomb*, 17 Ib. 183; *Reese* v. *Wyman*,

9 Geo. 430; *Townshend* v. *Stangroom,* 6 Ves. 328, 339; *Henkle* v. *Royal Assurance Co.* 1 Ves. 317.

2d. Admitting the mistake alleged, the complainant is not entitled to have it corrected because, it must have arisen from *his own negligence.* The rule is, that in order to entitle the party to relief in equity, the mistake must be as to a fact of such a nature, that the party could not, by reasonable diligence, get knowledge of it when put upon inquiry. *Taylor* v. *Fleet,* 4 Barb. Sup. Ct. 95; 1 Story, Eq. §§ 105, 146; *Wood* v. *Patterson,* 4 Md. Ch. Dec. 335; *Marine Ins. Co.* v. *Hodgson,* 7 Cranch, 336; *Lamb* v. *Harris,* 8 Geo. 546.

3d. The relief sought should be denied, because the mistake (if any) arose without any fault on the part of the defendant or even of F. M. Dimond. If the parties act fairly, and it is not a case where one is bound to communicate the facts to the other, upon the ground of confidence or otherwise, then the court will not interfere. 1 Story, Eq. §§ 147, 148, 150, 151.

4th. If the mistake were proved and the complainant entitled to relief upon other grounds, the contract should not be altered in this case, because the complainant has been guilty of culpable negligence, in not sooner disclosing the mistake to the defendants.

5th. This contract cannot be varied or reformed without unjustly affecting the rights of other parties. A mistake in a written contract will not be corrected to the prejudice of innocent parties who had no notice of the mistake. *United States* v. *Munroe,* 5 Mason, 572; *Hesler* v. *Zimmerschitte,* 1 Texas, 50. This is analogous to the principle, that a court of equity will interfere, in cases of mistake in written instruments, only as between the original parties and those claiming under them in priority. 1 Story, Eq. § 165.

AMES, C. J. A court of equity has no power to alter or reform an agreement made between parties, since this would be in truth a power to contract for them; but merely to correct the writing executed as evidence of the agreement, so as to make it express what the parties actually agreed to. It follows, that the mistake which it may correct in such a writing must be, as it is usually expressed, the mistake of *both* parties to it; that is,

such a mistake in the draughting of the writing, as makes it convey the intent or meaning of neither party to the contract. If the court were to reform the writing to make it accord with the intent of one party only to the agreement, who averred and proved that he signed it, as it was written, by mistake, when it exactly expressed the agreement as understood by the other party, the writing, when so altered, would be just as far from expressing the agreement of the parties as it was before; and the court would have been engaged in the singular office, for a court of equity, of doing right to one party, at the expense of a precisely equal wrong to the other. *Henkle* v. *The Royal Exchange Assurance Co.* 1 Ves. Sen. 317; *The Marquis of Townshend* v. *Stangroom*, 6 Ves. 333, 334; Adams, Eq. 171.

Now the parties to this contract of subscription, which we are asked to reform so as to make it a subscription for one thousand dollars instead of two, are, as the parties to the bill indicate and suppose, the subscriber, on the one side, and the railroad company, whose capital stock he subscribed to, on the other. Francis M. Dimond, who handed the subscription-book to the complainant, and as a friend and neighbor urged him to subscribe, so far from being a party to the complainant's contract of subscription, in the sense of the party with whom he contracted, appears himself, about the same time, to have entered into a several contract with that same party, the railroad company, for the same amount of its stock, by writing his name on the same subscription-book directly below the name of the complainant, as a subscriber, for twenty shares of it. In other words, each thus contracted, not with the other, but with a corporation, existing, but not yet organized, to take the number of shares of stock set opposite his name, provided responsible subscriptions to the amount of $175,000 could be obtained; and when these were obtained, and the railroad company upon the faith of them proceeded to organize and to act, the subscription contract of each with the company became perfect and mutually binding both upon the subscribers and the company, as the respective parties to the contract.

To enable us then to correct this subscription paper in the mode requested by the complainant on the ground of mistake,

we must be satisfied, that by so doing we shall make it conform to the understanding of the contract by the railroad company at the time they entered into it, as well as of the complainant at the time that he subscribed it. Now there is no evidence that the company, as an organized body, or any officer or agent of the company appointed to represent it, had any notice whatever at the time of the organization, that this subscription was not precisely what the complainant designed it to be; nor indeed does it seem that any effectual means were taken to apprise them that it was not, until long after, when, according to a previous promise to the complainant, Francis M. Dimond addressed to the president of the company a letter under the date of December 6, 1853, some nine months after the organization of the company, and received the proper reply, that the company having acted upon the subscription of the complainant, it was too late to allow him to retract it.

So far then is this from having been a mistake of both parties to the contract, that it is the mistake, if it may be so called, of one only; the other having been suffered to act and contract during many months upon the faith that the subscription was precisely what it was designed to be, and no diligence whatever used to give notice to the contrary. If there was, as it would seem, negligence on the part of Francis M. Dimond in performing his promise to the complainant, that he would give early notice to the company of the facts concerning this subscription as they are now claimed to be, which might have been done on the very day that the company met for organization, it was the negligence of the agent of the complainant, and he, and not the company, must bear the consequences of it.

Without therefore going into the question, whether, considering the grounds of the well-known rule of evidence, it would be proper, however competent, to alter a written contract, unambiguous in its terms, upon oral proof alone of a supposed mistake in them, and such proof consisting almost wholly in the testimony of the party applying for the alteration, we must decline to reform this subscription in the mode proposed, upon the distinct ground, that it is not competent for us thus to make it express the contract of one party, when, by so doing, we shall

make it cease to express the contract which the other party fairly entered into, and so long acted upon.

But besides the power to *reform* a writing, so as to make it express the agreement of both parties as it was designed to do, a court of equity has also power to *rescind* and *cancel* an agreement at the request of one party, upon the ground that, without negligence, he entered into it through a mistake of facts material to the contract, when it can do so without injustice to the other party. Although relief of this character has not been specially asked of us, and indeed, the complainant has already paid half of this subscription as the condition of a former continuance of the suit at law against him by the respondents to recover the whole of it, it may not be improper for us to add, that the case of the complainant, even as he claims it to be proved, would not entitle him to this relief. There was no mistake here at all, in the sense in which a court of equity recognizes it in order to relief. The complainant, at ease in the library of his own house, after having been urged by a friend to double, or at least to renew his subscription, with his own hand, deliberately subscribes his name in the book before him, setting opposite to his name in figures, the number of shares (20), and the amount in money ($2,000), which he engages to take in the stock of this railroad. Grant that he designed, and at the time expressed the design, of renewing only his old subscription of a thousand dollars; yet it is not possible to account for his actual subscription otherwise than by supposing, either, that at the moment he had forgotten what the amount of his old subscription was, or, that he wrote this subscription with a mind so preoccupied with something else that he did not attend to what he wrote. As a witness he does not attempt to account for it; but merely states the fact, that designing one thing, he did another. Now as the complainant, so far from being weak or hallucinated, is eminent amongst us for his knowledge and employment in affairs both private and public, nothing but want of recollection or attention, which necessarily import, in such a personal act, negligence or carelessness on his part, could have permitted his hand to write what his will did not direct. When in addition to this it is considered, that notwithstanding his discovery

12 *

of his negligence on the same day, there seems to have been equal negligence on his part, or what is the same thing, on the part of F. M. Dimond, his agent, in rectifying the error caused by it, and in afterwards apprising the railroad company of it, so that, as far as we can learn from the testimony, months elapsing, the corporation was not only organized but contracted for the construction of their railroad long before notice was given of his mistake to their officers, it will be seen, at once, that there is no pretence for this species of relief, whether we look at the neglect of the complainant, or the injustice which relief against it would cause to the respondents. In cases like this, where there has been no intermixture of fraud or surprise to put the applicant for relief off his guard, we must invent a new head of equity before we can interpose to save him, to the injury of others, against the effects of his own carelessness.

*The bill must be dismissed with costs.*