DECISION
"When the love fades, what becomes of the money?"[1] If this case stands for any proposition, it is that mixing love and money without marriage is fraught with peril. This unmarried couple's fourteen year relationship disintegrated in the throes of accusations and acrimony as they attempted to decipher their respective interests in property acquired during their relationship.
Before this Court is the Plaintiff Dana Ellen Flori's ("Flori" or "plaintiff") petition for partition of certain real property located in Warren, Rhode Island. The Defendant Davison Bolster ("Bolster" or "defendant") claims that he is the sole owner of the property and that the deed naming the parties as joint tenants was a result of the parties' mutual mistake. Therefore, the defendant requests reformation of the deed and that the plaintiff's petition for partition be denied. This Court's jurisdiction is pursuant to G.L. 1956 § 8-2-13.
 Facts and Travel
This Court makes the following findings of fact. The parties to this action met in 1985 and began a long lasting intimate relationship four years later in 1989. (Sept. 23, 2004, Hearing Transcript at 4-5.) Throughout the couple's relationship, the plaintiff maintained steady employment as an administrative assistant to a bank executive. The defendant's work history is more eclectic as he divided his time between working as a free-lance artist, carpenter, and volunteer in the community of Warren in a variety of capacities.[2] (Tr. 9/23/04 at 3, 64.)
In 1994, Flori purchased a "fixer upper" home in Pomfret, Connecticut. Id. at 6, 13. The acquisition of the property was financed by a rehabilitation loan taken out by the plaintiff.Id. at 9. Pursuant to the terms of the loan, construction at the property had to be supervised by a licensed general contractor and completed within six months of the loan's commencement. Id. at 10. As a result, Bolster obtained a general contractor's license and worked full-time on the rehabilitation project — with the help of subcontractors, friends, and family — in order to have it completed by the deadline. Id. Although the defendant never asked for compensation for his work, Flori paid for his meals, wrote multiple checks to him for his labor, and paid some of his bills during the months he was working on the home. (Tr. 9/23/04 at 12-13; Nov. 18, 2004, Hearing Transcript at 122-26; Pl.'s Ex. 29, Ex. 30.)
Five years later, in 1999, the couple became involved in another real estate transaction when the defendant signed a Purchase and Sales Agreement to buy the property located at 53 State Street in Warren, Rhode Island (the "Property"), for the total purchase price of $83,500. (Def.'s Ex. C.) Because Bolster knew that his income and credit history would not qualify him for a loan, he asked the plaintiff to co-sign the loan application.[3] (Tr. 9/23/04 at 18.) Concerned with the repercussions of incurring such an obligation, the plaintiff called her brother — an attorney practicing real estate and commercial law in the U.S. Virgin Islands — for advice. (Sept. 14, 2004, Hearing Transcript at 1-2, 4.) Initially, although he believed the purchase would be a "great investment" because of the Property's proximity to the water, he advised the plaintiff against making such a commitment because he was worried about the long-term stability of the couple's relationship. Id. at 5, 7. Eventually, when she decided to move forward with the transaction, he recommended that she acquire the Property in a joint tenancy so that she could seek a partition if her relationship with Bolster deteriorated. Id. at 7-8.
Prior to proceeding with the purchase, Flori reached agreement with Bolster regarding a number of conditions to her participation in the acquisition of the Property. (Tr. 7/23/04 at 5.) More specifically, the parties agreed that the mortgage, insurance, and taxes would be timely paid each month, the second unit in the house would be rented in order to cover expenses, and the mortgage would be refinanced if they were not ultimately married. (Tr. 7/23/04 at 5, 46; Tr. 9/23/04 at 17.) At the time, Flori and Bolster were engaged, and although Flori expected that they would eventually be married, the defendant did not believe marriage was a realistic possibility. (July 23, 2004, Hearing Transcript at 2; Tr. 9/23/04 at 16, 65.)
On August 13, 1999, the plaintiff signed an application for a loan of $75,150 to purchase the Property. (Pl.'s Ex. 6.) Under the heading, "Property Information and Purpose of Loan", the application indicated that the title to the Property would be held in "Joint Tenancy."[4] Id. About three weeks later, on September 1, 1999, the defendant added his signature to the loan application at the closing.[5] (Id.; Aug. 20, 2004, Hearing Transcript at 11.) Ultimately, Columbus Credit Union approved the loan and, with the assistance of $7,500 in gift money from Bolster's parents, the couple purchased the Property. (Gift Letter, Pl.'s Ex. 6.)
The closing took place over two days — August 31, 1999 and September 1, 1999 — at the law office of William Dennis in Bristol, Rhode Island.[6] (Tr. 8/20/04 at 2.) Prior to that time, all communication regarding the purchase of the Property — from the broker to the lender — that was received by Dennis included both the names of the plaintiff and defendant. Id. at 7. During the closing, a number of documents were signed by Flori and Bolster, and the warranty deed was executed by the seller.Id. at 8, 12. The deed signed by the seller reads:
 "KNOW ALL MEN BY THESE PRESENTS, THAT I, SHARYN E. SAUNDERS, of the Town of North Kingston, State of Rhode Island, for consideration paid, grant to DAVISON G. BOLSTER and DANA-ELLEN FLORI of 53 State Street, Warren, Rhode Island as Joint Tenants and not as Tenants in Common . . ." (Def.'s Ex. K.)
Shortly thereafter, the defendant moved into the Property and made it his primary residence. The second unit in the home was rented to a tenant for $550 a month. (Tr. 9/23/04 at 36.) Although Flori considered moving to Warren, renting out part of her Connecticut home, and converting the rest into an art studio for Bolster, she continued to reside in Connecticut following the closing. (Tr. 7/23/04 at 50.) Approximately four months after the purchase, difficulties in the couple's relationship escalated and resulted in their permanent separation. Id. at 51.
Three years passed following the break up when, to the plaintiff's surprise, she learned that the Property was scheduled to be sold at a tax sale. Id. at 15. Although a certified letter was mailed to the plaintiff regarding the delinquent tax payments, Bolster signed for it and failed to notify Flori. Id.
Flori remained unaware of the delinquency until she noticed "[her] name in the paper for a tax sale." Id. (Pl.'s Ex. 11.) She later paid $1,626.39 to settle the tax debt. Id. (Pl.'s Ex. 13.) The plaintiff also received five separate notices — between April 30, 2002 and June 24, 2003 — from the Columbus Credit Union stating that the loan payments on the Property were late. (Pl.'s Ex. 12) As a result, Flori made multiple payments to the lender in the amounts of $414.74, $921.74, and $414.74. (Tr. 7/23/04 at 19-21; Pl.'s Ex. 13.) She was "furious" upon discovering the late payments because she believed her credit would be ruined and, although the parties were in contact with one another following their break up, Flori stopped communicating with the defendant because of her frustration. (Tr. 7/23/04 at 25.) In total, Bolster was late on the loan payments sixteen times. (Tr. 9/23/04 at 91-92.)
Throughout 2003, the defendant made numerous attempts to contact the plaintiff to "stay in touch," but she never returned his calls. Id. at 30. Eventually, Bolster decided to refinance the Property and learned that he needed the plaintiff to sign documents in order to do so. Id. at 31. Although the defendant called the plaintiff on multiple occasions regarding the refinancing, he was never able to speak with her. Id. On the day of the closing, in October 2003, Bolster made one more futile attempt at contacting the plaintiff when he resorted to calling Flori's mother from the closing attorney's office. Id. at 32. When the plaintiff finally learned of the defendant's situation, she refused to sign the papers necessary to allow the refinancing.
In a letter, dated October 27, 2003, the plaintiff informed the defendant that she wanted $35,000 in compensation for the money she had paid towards the delinquent taxes and late mortgage payments and for the damage he had caused to her credit. (Def.'s Ex. H.) In addition, the letter warned that if Bolster did not pay her $35,000, Flori would "require a much greater share of the equitable value of 53 State Street." Id. Subsequently, on November 21, 2003, the plaintiff filed an action to partition the Property with the Rhode Island Superior Court, seeking "a fair and equitable portion of the equity of the real estate located at 53 State Street, Warren, Rhode Island, based upon her contributions."
The defendant opposed the plaintiff's request for partition claiming that the parties did not intend to create a joint tenancy and, as a result, the plaintiff could not seek a partition from the Court. (Def.'s Prehearing Memo filed May 26, 2004.) Later, on June 25, 2004, Flori amended her petition for partition adding a request that the partition be made by sale pursuant to G.L. 1956 § 34-15-1 et. seq. In opposition, the defendant amended his answer, raised the affirmative defense of the Statute of Frauds, and set forth a counterclaim arguing that the deed referencing the joint tenancy was the result of a mutual mistake and, therefore, should be reformed by the Court. The parties elected to proceed to trial without a jury and this Court heard testimony intermittently from both parties and their witnesses, between July 23, 2004 and November 18, 2004.[7]
 Standard of Review
In a non-jury trial, the trial justice sits as the trier of fact as well as of law. Hood v. Hawkins, 478 A.2d 181, 184
(R.I. 1984). "Consequently, he weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences." The factual determinations and credibility assessments of a trial justice "traditionally accords a great deal of respect . . . [because it is] the judicial officer who actually observe[s] the human drama that is part and parcel of every trial and who has had the opportunity to appraise witness demeanor and to take into account other realities that cannot be grasped from a reading of a cold record." In the Matter of theDissolution of Anderson, Zangari Bossian, No. 2004-187-A., slip op. at 2 (R.I., filed Jan. 13, 2006). Although the trial justice is required to make specific findings of fact, "brief findings will suffice as long as they address and resolve the controlling factual and legal issues." White v. Le Clerc,468 A.2d 289, 290 (R.I. 1983); Super. R. Civ. P. 52(a).
 Plaintiff's Right To Partition
The plaintiff asks this Court to order a partition by sale of the property located at 53 State Street, Warren, Rhode Island. Section 34-15-1 of the Rhode Island General Laws states:
 "All joint tenants, coparceners, and tenants in common, who now are or hereafter may be actually seised or possessed of any estate of inheritance in any lands, tenements or hereditaments, whether in their own right or as receiver appointed by any state or federal court, or as trustee in bankruptcy, may be compelled to make partition between them of those lands, tenements, and hereditaments by civil action."
Furthermore, pursuant to G.L. 1956 § 34-15-16, the court may order a partition by sale:
 "In an action for partition, the superior court may, in its discretion, upon motion of any party to the action, order the whole premises sought to be divided, or any particular lot, portion, or tract thereof or the interest of the plaintiff or plaintiffs or of the defendant or defendants in the whole premises, or in any particular lot, portion, or tract thereof, to be sold, either at public auction or by private contract, under the direction of the court, by the commissioner or commissioners appointed to divide or sell the same; provided, that if the sale is made by private contract, it shall not be made for less than the sum fixed by the court in its decree authorizing the sale by private contract."
"A petition for partition where the property is not capable of partition by metes and bounds is addressed to the sound judicial discretion of the trial justice who is required to consider all facts and circumstances in evidence before granting partition."DeBartolo v. DiBattista, 117 R.I. 349, 353, 367 A.2d 701, 703
(1976) (citing Bianchini v. Bianchini, 76 R.I. 30, 68 A.2d 59
(1949)). "However, the general rule is that inconvenience or difficulty in making the partition or hardship or substantial loss or injury to some or all of the parties does not affect the right to partition." Id. (citing 68 C.J.S. Partition § 48 (1950); De Roulet v. Mitchel, 70 Cal.App.2d 120, 124,160 P.2d 574, 576 (1945); Henkel v. Henkel, 282 Mich. 473, 481,276 N.W. 522, 524-25 (1937); Thomsen v. Thomsen, 196 Okla. 539, 543-44,166 P.2d 417, 421-22 (1946)).
In the instant matter, the plaintiff maintains that a partition by sale is appropriate because the property is not capable of partition by metes and bounds and because she owns the Property as a joint tenant with the defendant. "[A] true joint tenancy has always been characterized by the existence of all the four unities of time, title, interest and possession." Millman v.Streeter, 66 R.I. 341, 346, 19 A.2d 254, 257 (1941). Moreover, although the contrary may be shown, the share of ownership in a joint tenancy is presumed to be equal. Lucchetti v. Lucchetti,85 R.I. 105, 111, 127 A.2d 244, 248 (1956) (citing 48 C.J.S.,Joint Tenancy, § 6, p. 930). Here, the documentary evidence clearly indicates that a joint tenancy was created when the Property was transferred in late 1999. The warranty deed names both the plaintiff and the defendant as "Joint Tenants and not as Tenants in Common" and the loan application — signed by both parties — specifies that the parties were acquiring the Property as joint tenants.
 Reformation of the Deed
Despite the unequivocal written evidence that the parties hold the Property as joint tenants, the defendant argues that it was not their intention to create a joint tenancy and that he is the sole owner of the Property. Bolster asserts that the recordation of the real estate transaction as a joint tenancy was the result of action taken by the bank as to which both the plaintiff and defendant were mistaken and, therefore, should merit the reformation of the deed. Furthermore, Bolster claims that the plaintiff co-signed the loan as a mere gratuity: she intended only to help him and repay him for the work he had performed rehabilitating her home in Connecticut five years earlier and not to create an ownership interest.
Generally, the parol evidence rule "renders inadmissible any evidence of prior or contemporaneous collateral agreements aimed at altering, varying or contradicting a written document in the absence of fraud or mistake." Industrial National Bank of RhodeIsland v. Peloso, 121 R.I. 305, 310, 397 A.2d 1312, 1314 (1979) (citations omitted). The exception to the parol evidence rule, that parol evidence is admissible to show mutual mistake in seeking reformation of written instruments, is applicable in the case at hand. Conti v. Fisher, 48 R.I. 33, 35, 134 A. 849, 849
(1926). In McEntee v. Davis, 861 A.2d 459 (R.I. 2004), the Rhode Island Supreme Court engaged in a thorough discussion of the law of mutual mistake:
 "By definition, a mutual mistake is one that is `common to both parties wherein each labors under a misconception respecting the same terms of the written agreement sought to be canceled.' Rivera v. Gagnon, 847 A.2d 280, 284 (R.I. 2004) (quoting Leonard v. McDowell, 824 A.2d 1266, 1270 (R.I. 2003)). `An agreement containing a mutual mistake fails in a material respect correctly to reflect the understanding of both parties.' Rivera, 847 A.2d at 284. For the court to intervene and correct a written instrument, there `must be, as it is usually expressed, the mistake of both parties to it; that is, such a mistake in the draughting [sic] of the writing, as makes it convey the intent or meaning of neither party to the contract.' Vanderford v. Kettelle, 75 R.I. 130, 142, 64 A.2d 483, 489 (1949) (quoting Diman v. Providence, Warren, and Bristol R.R. Co., 5 R.I. 130, 134-35 (1858))." Id. at 463.
In addition, the Court noted that "[a] party must prove mutual mistake by clear and convincing evidence before the court will reform, vacate, or dismiss a contractual agreement. Id. (citingRivera, 847 A.2d at 284).
The defendant relies on our Supreme Court's decision inStephenson v. Stephenson, 811 A.2d 1138 (R.I. 2002), in urging this Court to find that a joint tenancy fails to exist in the case at hand because the documentary evidence fails to reflect the parties' true intentions. In Stephenson, the Court was faced with the question of whether jointly held accounts were marital property and, ultimately, whether they should be distributed as such. Id. Following a trial, the Family Court found that the husband was the sole source of the accounts' funding and that "`neither party contributed to [the accounts'] preservation or appreciation' during the marriage." Id. at 1142. Despite these findings, the court held that the accounts constituted marital property. Id. at 1141. On appeal, the Supreme Court overturned the decision concluding that because the husband added his wife's name "merely for convenience and for estate planning reasons", he did not have the requisite intent to create any present possessory interest for his wife in the joint accounts. Id. at 1143. As a result, the marital estate was reduced by the amount of money in the accounts, and such money was not distributed to the wife. Id.
There are numerous distinctions between the facts ofStephenson and those in the instant matter that prevent this Court from finding, as the defendant suggests, that the documentary evidence mistakenly represents the parties' understanding regarding the plaintiff's interest in the Property. First, in the case at hand, the overwhelming evidence demonstrates that Flori was hardly added to the deed out of "convenience." Clearly, the plaintiff's contribution — obligating herself on the loan — was necessary to the defendant's acquisition of the Property. Second, unlike the wife inStephenson, Flori incurred liability by co-signing the loan and becoming a joint tenant of the Property. She was not simply reaping the benefit of real estate ownership without subjecting herself to any risk. Third, it should be noted, the addition of a party to a bank account does not require the strict formalities — the four unities — that are necessary to create a joint tenancy. These formalities make it much less likely that a party would be named as a joint owner on a deed — rather than on a bank account — "merely for convenience."
Ultimately, clear and convincing evidence was not presented indicating that the recordation of the parties as joint tenants was the product of mutual mistake. All of the written evidence indicates that the parties intended to create a joint tenancy. In addition, the documentary evidence is consistent with the advice the plaintiff received from her brother, the attorney, who suggested that she hold the Property as a joint tenant in order to minimize her risk in the transaction. Moreover, as previously mentioned, the very nature of the creation of a joint tenancy makes it unlikely that such a disposition would result without the intent of the parties.
The defendant's assertion that the plaintiff co-signed the loan as a kind gesture to repay him for his work on her home in Connecticut is undermined by the facts of the case. The evidence demonstrated that Flori wrote checks to Bolster for his labor during the time the construction was being performed, the co-signing of the loan occurred five years later, and the defendant failed to recall any specific conversation or identify any evidence indicating that the plaintiff offered to co-sign the loan as a gratuity. (Tr. 9/23/04 at 104-05.) Furthermore, despite Bolster's suggestion that Flori's offer to settle the controversy for $35,000 was an acknowledgement of something other than an ownership interest in the Property, this Court finds that the record, as a whole, supports Flori's contention that she made the offer in the hopes of extricating herself from an undesirable and deteriorating financial arrangement.
In summary, there were inherent risks in this financial arrangement that were obvious to the parties. This was a longstanding personal relationship, each knew the others weaknesses and strengths, each knew the others abilities and talents, and each knew this collaborative financial venture was based upon a suspect and dysfunctional romantic relationship prior to the purchase of the Property. Mindful that "[e]quity is a flexible concept which involves rejection of rigid rules to accomplish what is fair and just in a particular situation[,]"In re Marker, 142 B.R. 734, 742 (1992), and after careful consideration of all the evidence before it, this Court finds that the plaintiff and defendant own the Property as joint tenants and, pursuant to § 34-15-1 and § 34-15-16, orders the Property to be partitioned by sale.
 Attorney's Fees
Both the plaintiff and the defendant have sought an award of attorney's fees from the Court. Pursuant to G.L. 1956 § 9-22-6
and G.L. 1956 § 34-15-22, which happen to contain identical language, costs may be awarded in a partition action:
 "In all actions of partition, the court before which the action may be pending may adjudge and determine, as to it shall appear equitable and just, relative to the apportionment of costs among the parties, plaintiff and defendant, by dividing the costs equally or subjecting either party to the payment of the whole or any part thereof."
Our Supreme Court has defined the costs associated with a partition action to include attorney's fees. Francis v.Francis, 81 R.I. 346, 348, 102 A.2d 872, 872 (1954) (citingRedecker v. Brown, 15 R.I. 52, 23 A. 62 (1885); Robinson v.Robinson, 24 R.I. 222, 52 A. 992 (1902)). Furthermore, the decision to award such fees is left up to the "sound discretion" of the superior court justice. Barney v. Barney, 83 R.I. 182,185, 114 A.2d 399, 401 (1955) (citing Francis, 81 R.I. 346,102 A.2d 872). The trial justice is vested with the authority "to make the [attorney's fees] assessment conform to the special circumstances of a case where it would be equitable and just to do so." Id.
In the case at hand, the Court finds that an award of attorney's fees should not be granted to either party. The improvidence of both the plaintiff and the defendant contributed to the unfortunate state of affairs that is now before this Court.[8] Bolster naïvely asked the plaintiff to co-sign the loan and, apparently, did not consider the repercussions of executing a legally binding document. Conversely, Flori inexplicably failed to take any action — for long periods of time — after receiving notice of the delinquent mortgage payments and, also, inexplicably cut off communication with Bolster despite her ownership interest in the Property. In addition, the sacrifices made by the parties — the defendant's work on the plaintiff's Connecticut home and the damage to the plaintiff's credit score — sufficiently offset one another. Considering these factors and that there is no evidence of bad faith on the part of either party, the Court finds that it would be inequitable to award attorney's fees to either the plaintiff or the defendant.
 Conclusion
Based upon the facts and circumstances presented, the Court denies the defendant's request to reform the deed and orders the Property partitioned by sale. The equity in the Property is to be divided evenly by the parties after deduction of the mortgage amount and other customary adjustments at closing. Given the defendant's connection to this property, the Court grants him a right of first refusal with respect to the sale, the purchase price to be reduced by his equity in the Property. The defendant is also permitted a credit of $7,500 for the money he received from his parents for the down payment on the Property. Whether this money was a gift or a loan, the evidence establishes that it was intended to benefit their son Davison Bolster's participation in this purchase. Finally, the Court does not find it appropriate to give the plaintiff a credit for any payments she made towards the mortgage and taxes. The Court balances these payments against the defendant's financial contributions and upkeep of the Property, notwithstanding his deficient performance at times.
The parties shall submit a judgment in conformity with this decision.
[1] See Jeff D. Opdyke, Before `I Do' . . . Don't Do This,
Providence Journal, April 16, 2006, at F7 (reprint Wall Street Journal article). This timely article chronicles the rise in property disputes between unmarried couples and offers guidance on how to avoid the dreaded question — who really owns what — when the relationship dies.
[2] The defendant assisted in drafting the town's comprehensive plan, was a member of the town's planning board, and helped establish a number of organizations in the town aimed at revitalizing its businesses.
[3] The mortgage officer, Doris Doyle, testified that the defendant could not obtain a loan on his own because of his low income and limited credit history. (July 23, 2004, Hearing Transcript at 14-16; Pl.'s Ex. 7.) In addition, she stated that the plaintiff had a "good credit score" because she "pays everything on time." Id. at 13.
[4] In a document filled out during the loan application process, the plaintiff checked off joint tenancy as the manner in which the parties intended to hold the Property. (Pl.'s Ex. 24.)
[5] Bolster originally filled out and signed an application for a loan to purchase the Property as the sole owner on June 14, 1999. (Pl.'s Ex. 6.)
[6] Mr. Dennis testified that typically his job is to represent the lender and that "[t]he best situation for a lender is to have complete unity of the obligation on the debt and title and collateral." (Tr. 8/20/04 at 6.)
[7] Following the trial, the parties each submitted a supplemental memorandum concerning the applicability of constructive trust law to the facts of the case. After reviewing the arguments, the Court is convinced that a constructive trust theory is not viable in this matter. Moreover, no evidence was offered in support of this theory of recovery at trial.
[8] The naïveté of the parties is exemplified by the following exchanges between plaintiff's counsel and the defendant and between defendant's counsel and the plaintiff. Bolster testified as follows:
 "Q: You weren't engaged?
 A: We were never formally engaged, never exchanged rings or had —
 Q: Well, you said that there were two offers of marriage, one she accepted and one — the second time she accepted the offer of marriage, correct?
 A: Yes.
 Q: And after a person accepts an offer of marriage aren't, at that point don't they become engaged?
 A: I don't know.
 Q: So your understanding, or notwithstanding an offer of marriage and your relationship at that time, you didn't have the status of fiancé; is that correct?
 A: I didn't feel until we had exchanged rings that it would be a formal engagement." (Tr. 9/23/04 at 65.)
Plaintiff Flori testified as follows:
 "Q: And is it fair to say you and he were close?
 A: We were engaged.
 Q: Trusting?
 A: For the most part.
 Q: Helped each other?
 A: Yes." (Tr. 7/23/04 at 41.)